38 N.Y.2d 445 (1976)
Harry Kraut, Respondent,
v.
Morgan & Brother Manhattan Storage Co., Inc., Appellant. (And a Third-Party Action.)
Court of Appeals of the State of New York.
Argued October 15, 1975.
Decided January 6, 1976.
Morris Zweibel for appellant.
O. John Rogge for respondent.
Judges WACHTLER, FUCHSBERG and COOKE concur with Judge GABRIELLI; Judge JASEN dissents and votes to reverse in a separate opinion in which Chief Judge BREITEL concurs; Judge JONES dissents and votes to reverse in another separate opinion.
*447 GABRIELLI, J.
Plaintiff, a collector of rare Russian enamels, placed approximately 300 of his acquisitions, valued at $731,000, in storage with defendant, a commercial bailee, on the eve of an extended trip to Europe. When he sought their return, defendant was unable to redeliver the bailed goods, they having been stolen from its warehouse. After advertising that he would pay a reward for their return, plaintiff recouped most of the stolen items by paying an unidentified "intermediary" a $71,000 ransom. In this action, plaintiff seeks to recover that sum and the value of 19 other items not returned.
The jury awarded plaintiff $45,000 as the reasonable ransom payment and $27,000 for the items not recovered. By a divided vote, the Appellate Division affirmed (46 AD2d 19). Defendant appeals only from so much of the order entered below as affirmed the ransom payment award.
Upon the trial and during plaintiff's cross-examination he declined to divulge the name of the intermediary with whom he dealt on the stated ground that his physical well-being and that of his wife and children had been threatened. The issue, created by defendant, is whether plaintiff can successfully maintain this action.
Testimony adduced at trial established, without contradiction, that on June 12, 1970 prior to leaving for Europe, plaintiff delivered the Russian enamel collection to defendant for safe keeping. On July 28, 1970 an individual called defendant and, claiming to be plaintiff, said that he was sending someone over to pick up the collection. Without checking the messenger's identity, defendant turned over possession of the bailed items. Upon returning in August, plaintiff received a statement from defendant indicating that his storage space had been vacated and when plaintiff advised defendant that the stored goods had not been removed by him or at his direction, defendant caused an inquiry to be made and learned, for the first time, that the collection had been stolen.
The assistance of the New York City Police Department and the Federal Bureau of Investigation was enlisted but to no avail. The plaintiff also, in conjunction with his insurer, placed an advertisement in the New York Times offering a reward for the return of the enamels. He also made it known *448 in the antique trade that he was willing to pay a reward for the return of the collection.
Thereafter, an individual called the plaintiff and said that he had heard of the offer circulated in the antique trade and that he would be willing to return the collection for a reward "in the nature of something like $150,000." Following further negotiations, plaintiff met and paid the caller $71,000, in exchange for which all but 19 pieces of his collection was returned. On cross-examination, he admitted knowing the name of the go-between, but that he was in mortal fear of revealing it and thus declined to do so.[1] On redirect, plaintiff stated that his refusal was based on threats communicated to him to the effect that "I would be killed gangland style" and that "before this was accomplished, [I would] have the privilege to see my older daughter walk with a cane and seeing eye dog, and no amount of operations would restore my wife's face."[2]
David Keller corroborated plaintiff's testimony and likewise refused to identify the intermediary on cross-examination.
The jury was subsequently charged that:
"If you find that the Plaintiff paid a reward of $71,000.00 and that such payment was reasonable in light of the fair market value of the items that he recovered, and you find that the Defendant is liable to the Plaintiff on the cause of action on the bailment, he may recover such sum from the Defendant. *449 Of course, if you decide against the Plaintiff, on the bailment cause of action, the Plaintiff cannot recover on this second cause of action for the recovery of the reward paid.
"You will recall that the Plaintiff would not divulge the name of the person to whom he claims the money was paid, and he explained the reason. He also said that he paid the money in cash and that none of this was reported to any law enforcement agency. These are all matters for you to consider.
"They are not matters that bar the recovery, they are matters that go to credibility, that is, the weight, you wish to give to this witness' testimony. It is for you to determine who and what to believe. In this law suit, it is incumbent upon the Plaintiff to establish each item of this case by a fair preponderance of the credible evidence. Until you are satisfied, as reasonable men, that the evidence has fairly and reasonably established the facts asserted by the Plaintiff, he has not sustained that burden of proof."
Defense counsel took no exception to this portion of the charge and, as stated, the jury found in favor of plaintiff.
In this connection, we would note that defendant did not disagree with the theory upon which the case was to be determined by the jury. In fact, by his failure to except to the charge, defendant consented to and impliedly agreed with the trial court's determination that the only importance to be attached to plaintiff's declination to reveal the name of the intermediary related only to the credibility of his testimony. Thus, defendant consented to the law to be applied in the case (Martin v City of Cohoes, 37 N.Y.2d 162, 165-166, and the authorities cited therein). The jury having determined credibility in plaintiff's favor, the issue now raised by defendant ought not be reviewed.
As a matter of some significance it should be further noted that defendant never, adequately or otherwise, preserved any objection to the testimony of the plaintiff or the witness Keller, which in any way related to the nondisclosure of the intermediary's identity. Defendants' position in this regard and any request for sanctions against the plaintiff because of his refusal to reveal the identity, all took place in an in-chambers conference and, of course, away from the public eye of the courtroom and the jury. At that conference, when it was ascertained that disclosure could not be made, counsel for defendant (at the same conference) then requested "that the allegations contained in the provisions of the complaint relating *450 to the ransom must be dismissed and stricken, in view of Mr. Kraut's refusal to co-operate with the Court and with the Defendants". In denying the application, the Trial Judge again ruled that the question of disclosure was a matter of credibility for the jury and indicated that counsel could renew his motion at the end of the case. No exception was taken to this ruling and, significantly, the application was not thereafter made or renewed. In fact no objection was thereafter made to the testimony of the plaintiff or Keller relating to the nondisclosure of the identity of the intermediary. In all these circumstances defendant must be held to have waived any objection to such testimony of these witnesses (Pendarvis v Farmer Shell Serv. Sta., 37 N.Y.2d 718, affg on the mem thereat 43 AD2d 957; cf. Knoblach v Royal Globe Ins. Co, 38 N.Y.2d 471; Brady v Nally, 151 N.Y. 258, 263-266; see, also, 8 Carmody-Wait 2d, NY Practice, § 56:128 et seq.; 4 Weinstein-Korn-Miller, NY Civ Prac, pars 4017.05-4017.09).
A majority of the Appellate Division were of the view that although full disclosure is generally required of litigants in civil cases, under the exceptional circumstances of this case, a failure to disclose was properly made a matter of credibility for the jury. The dissenters stated that a plaintiff who seeks the aid of the courts must be prepared to disclose any material facts respecting his claim or forego it. We affirm.
This case bears a striking resemblance to Jones v Morgan (90 N.Y. 4) which, we think, is sound and should be considered controlling. In that case, Morgan, a commercial bailee, agreed to store and guard Mrs. Jones' furniture. The furniture was thereafter stolen and Jones sought to recover the loss from Morgan. The trial record reveals that plaintiff's husband testified, over strenuous objection, that he purchased some of the stolen property "from a thief through a detective; that was the only way I could get it". This court unanimously held that when defendant failed to redeliver plaintiff's property upon demand, he "became liable for the whole of it. What she did, therefore, to recover the property, so far as it was successful, was for [defendant's] benefit and he was entitled to a credit for the property thus recovered, less the expense of recovering it" (90 NY, at p 12; emphasis added).
The case at bar would be precisely the same had plaintiff hired a detective to do what he himself did  bargain with the thief to reacquire his own property. The distinction is obviously insignificant and thus we hold, as we did in Jones, that *451 a commercial bailee has no right to complain that instead of being charged for the whole loss, it is only being charged with the expense of recovering the goods.
We are urged to find, however, that plaintiff's failure to identify the intermediary was fatal to his cause in that it seriously prejudiced defendant's ability to controvert the allegations in the complaint. Apart from the fact that defendant did not properly preserve this issue for our review by objecting to the admission of plaintiff's or David Keller's testimony or by excepting to the relevant portions of the charge, we see no merit to the claim since defendant has not sufficiently demonstrated that it was prejudiced. The identity of the intermediary bears no relation whatsoever to defendant's liability which, of course, is founded on the nonreturn of bailed goods, a matter which defendant does not here deny; and, insofar as disclosure is related to the scope of damages, defendant has not shown, and, indeed, on argument, counsel could not state, what use would have been made of the intermediary's name had it been disclosed. Thus, defendant has not substantiated its claim of prejudice.
We do not intend to imply, however, that a party may always be excused from naming the thief with whom he dealt or that where a plaintiff refuses to disclose relevant information because he claims to have been threatened, that his testimony should automatically be credited. Rather, we simply hold that, under the exceptional circumstances which obtained here, the trial court, in its discretion, could properly have admitted the testimony and submitted the issue of its credibility to the jury.
The dissenters below and those in this court would have us conclude that any action to recover a sum of money paid to a thief, or his agent, for the return of property to the rightful owner is violative of public policy and cannot be maintained. In short, they would overrule Jones v Morgan (90 N.Y. 4, supra) and deny plaintiff a remedy on policy grounds despite the fact (1) that defendant was clearly and concededly negligent and culpable, (2) that plaintiff's actions mitigated defendant's possible liability from $731,000 to $71,000 and (3) that plaintiff candidly admitted recovering his own property and dealing with the intermediary.
We cannot agree with this unwarranted stretching of the public policy doctrine. Although "public policy" is a vague term, it "is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed *452 public interests" (Muschany v United States, 324 US 49, 66). In a concise definition, thrice reiterated by this court (Glaser v Glaser, 276 N.Y. 296, 302; Mertz v Mertz, 271 N.Y. 466, 472; Straus & Co. v Canadian Pacific Ry. Co., 254 N.Y. 407, 413), we have said that "when we speak of the public policy of the state, we mean the law of the state, whether found in the Constitution, the statutes or judicial records" (People v Hawkins, 157 N.Y. 1, 12). The rule cannot be otherwise for, as was long ago recognized, when courts attempt to define the limits of public policy without a firm foundation in precedent or law, they usurp the legislative function which is, of course, to define the public will (Cross v United States Trust Co. of N. Y., 131 N.Y. 330, 343-344; Vidal v Girard's Executor's, 2 How [43 US] 127).
We have not been referred to, and research has not disclosed, any constitutional rule, legislative enactment or court decision which supports the proffered doctrine of public policy. We are content, therefore, to rely upon engrained and well-founded precedent which requires us to decide the issues at bar and avoid a subjective search to establish a new, unique and novel policy for the State. As the ever eloquent Judge CARDOZO put it, courts should be "slow to substitute their own varying views of policy for those which have found embodiment in settled institutions, in every-day beliefs and practices, which have taken root and flourished" (Messersmith v American Fid. Co., 232 N.Y. 161, 164-165).
In sum, defendant, whose conceded negligence created plaintiff's predicament and caused him, his family and friend to suffer great anguish and distress and who, despite plaintiff's voluntary action mitigating its possible liability from $731,000 to $71,000, now seeks on the basis of an unpreserved objection to a tangential issue to be absolved of any liability whatsoever. On no view of this record or any extraneous public policy considerations is such injustice required in this case.
Accordingly, the order of the Appellate Division should be affirmed.
JASEN, J. (dissenting).
I am compelled to dissent from the majority's analysis of the novel and significant legal issues presented on this appeal.[*] Considerations of fundamental *453 public policy, as enunciated by statute and judicial decision, preclude the courts from lending their assistance to those seeking indemnification for the payment of ransom money. In my view, judicial recognition of a ransom indemnification cause of action would violate long-standing and deep-rooted conceptions of public justice. Moreover, it was error to excuse a plaintiff in a civil action for damages from testifying on a material issue because of an asserted claim of duress. An affirmance would also result in the unfounded creation of a new evidentiary privilege.
There are basic tenets of the common law which supervene and control the operation and effect of other public law, as well as private contract. (Riggs v Palmer, 115 N.Y. 506, 511; see The Kensington, 183 US 263, 269.) These principles are "dictated by public policy, have their foundation in universal law administered in all civilized countries, and have nowhere been superseded by statutes." (115 NY, at pp 511-512.) One of the most fundamental obligations of the judiciary, under a common-law system of jurisprudence, is the duty to deny litigants the assistance of the courts when judicial intervention "would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." (Loucks v Standard Oil Co., 224 N.Y. 99, 111 [CARDOZO, J.].) The courts should withhold their aid whenever "the cause of action in its nature offends our sense of justice or menaces the public welfare" (p 110).
Of course, members of the judiciary are not free to refuse to enforce rights on the basis of their own personal views as to what policies are fair, expedient and just. (224 NY, at p 111.) The courts are particularly reluctant to hold that a cause of action violates public policy in situations where the Legislature has already indicated its recognition and approval of the right sought to be asserted. (Messersmith v American Fid. Co., 232 N.Y. 161, 164-165.) Once the Legislature has adopted a policy and has made that policy the law of this State, it is beyond the province of the courts to question the ultimate wisdom of that choice. (Montgomery v Daniels, 38 N.Y.2d 41, 53.) Nevertheless, where a definite policy has not been set out by State Constitution or statute, the courts may, by judicial decision, express State policy. To deny the courts the power to speak on public policy would deny the courts the power to *454 pronounce the law, since all law reflects, to some degree, public policy. Where the maintenance of a cause of action would be "manifestly injurious to the public interest or shocking to our morals or contrary to fundamental principles of justice or `deep rooted traditions of the common weal'", the courts may properly refuse to enforce it. (Shannon v Irving Trust Co., 275 N.Y. 95, 103; Hollis v Drew Theol. Seminary, 95 N.Y. 166.)
In determining what the public policy is, the courts are referred to the law of the State, whether found in the Constitution, statute, or in judicial decisions and records. (Glaser v Glaser, 276 N.Y. 296, 302; Mertz v Mertz, 271 N.Y. 466, 472.) However, public policy may also emanate from other sources. Strong public policy may be found in the "prevailing social and moral attitudes of the community". (Intercontinental Hotels Corp. [Puerto Rico] v Golden, 15 N.Y.2d 9, 14.) From my review of the authorities, I would conclude that if a cause of action for ransom indemnification is found to be against the substantial interest of society as a whole, the courts, unless otherwise directed by Constitution or statute, should refuse to entertain suits seeking to enforce such a right of action.
The thief, by first removing Kraut's enamel collection from the defendant's warehouse and then holding it up for ransom, committed the serious felonies of grand larceny in the first and second degrees. (See Penal Law, §§ 155.05, 155.35, 155.40.) While this unlawful conduct gives rise to a private action for damages, in addition to the private injury, the peace of the community and the dignity of the State have also been gravely offended. (Cf. People v Lafaro, 250 N.Y. 336, 341.) Police officers, as guardians of the public peace, have the obligation to investigate and suppress this violation of law. (250 NY, at pp 342-343.) Upon the capture of the wrongdoer, the State will seek redress for the offense against it in the context of a criminal proceeding. It is quite apparent, and hardly necessary to add, that the public policy of this State is set against the commission of theft and extortion, as these felonies pose grave threats to societal peace, safety and order.
The State has an interest in assuring the prosecution of those who transgress its penal statutes. The law must throttle any tendency that would corrupt or hinder its pursuit of the guilty. (Union Exch. Nat. Bank v Joseph, 231 N.Y. 250, 254.) As Judge CARDOZO has stated, "[t]here is to be no traffic in the *455 privilege of invoking the public justice of the state." (231 NY, at p 253.) The authorization of a cause of action for the indemnification of ransom payments would infringe this pronounced State policy. Citizens, whose property was stolen while in the custody of others, would be encouraged to pay ransom for the return of the property knowing that the burden of any monetary loss would not ultimately fall on their shoulders. Co-operation with police investigations would be discouraged by the fact that police pursuit, whether successful in apprehending the culprits or not, might hinder ransom negotiations or result in the destruction or secretion of the property. Society must depend on the willingness of individual citizens to steadfastly come forward and report crime, assist in police investigation, and, if need be, testify at trial. (See People v Hicks, 38 N.Y.2d 90.) Allowing the recovery over of ransom payments threatens to deprive society of the co-operation necessary for safety of all of its members by supplying individual citizens with an incentive to keep silent and make payments to criminals. The law cannot properly encourage citizens to act upon individual self-interest to the detriment of the society as a whole and should not be set in motion to assist those who have "chosen to put private welfare above duty to the state." (Union Exch. Nat. Bank v Joseph, 231 N.Y. 250, 254, supra.) Courts may not tolerate any arrangement that stifles the law for private advantage (p 255).
Aside from the deleterious incentive given to the victims of crime, the creation of the ransom cause of action would have an obvious tendency to encourage would-be felons to commit criminal acts. Ransom payments, of course, reward wrongdoers for their transgression. The law recognizes that law-abiding individuals who make such payments under duress should not themselves be subject to criminal liability. Thus, a property owner who pays ransom is not subject to punishment, even though his action may adversely affect the community interest. However, a recovery over of that ransom payment poses even greater threats to the general community and exceeds permissible bounds. Criminals will be induced to steal bailed property and hold it for ransom, since the rightful owner will no longer be reluctant to pay. While the owner might not have been willing to expend his own resources in order to recover back his property, the reluctance disappears when another can be compelled to pay. In this manner, the peace and safety of all members of the community is threatened *456 since the resolve of individual citizens against caving in to the criminal element has been weakened.
The dangers presented by the novel cause of action asserted by the plaintiff are compounded when the property owner refuses to reveal identities of the parties with whom he dealt. A refusal to disclose the name of the thief or his agent not only may frustrate efforts of law enforcement officials and private investigators to track down the culprits, but might also, under certain circumstances, violate the Penal Law. (See Penal Law, § 205.50.) Thus, the reliance of the majority on Jones v Morgan (90 N.Y. 4) is misplaced. In Jones, the plaintiff did not, in stealth, attempt to ransom her property. Rather, recovery was made with the assistance of detectives, and, significantly, by the use of legal proceedings, such steps necessarily entailing the expenditure of funds. The court, therefore, allowed the defendant credit for the property recovered, less the expenses of the plaintiff. (90 NY, at p 11.) If Jones did, in fact, stand for the proposition asserted by the majority, I would believe it to be incorrectly decided. Although due respect must be given to a venerable case and to the learned Judges of this court who participated in its decision, the import of a ransom indemnification cause of action is so detrimental to the public interest that prior precedent should now be set aside.
The majority seems to believe the plaintiff's payment of ransom was a laudable attempt to mitigate damages. However, the law requires only that an injured party make reasonable efforts to limit the extent of the damage. (Losei Realty Corp. v City of New York, 254 N.Y. 41, 47.) Clearly, there can be no requirement that owners of property make risky and dangerous efforts to ransom their property. Moreover, the plaintiff's action was not motivated by a desire to reduce the burden on Morgan & Brother Manhattan Storage. Kraut stated that he seized upon the opportunity to ransom his property "because of my own selfishness". While the plaintiff may, as he deemed fit, permissibly pay the ransom, he may not attempt to shift the burden of that payment onto others, whether as an attempt to "mitigate" damages or otherwise. It should be noted that ransom negotiations are not always successful in obtaining the return of the stolen property. While Kraut may have recovered most of his property, the next person to go the ransom route might not only fail to rescue his property, but manage to interfere with and impede *457 official, as well as private investigations, frustrating their purpose and endangering the lives of those conducting such inquiries.
The majority indicates its belief that the plaintiff is somehow equitably entitled to relief from the courts. Yet the plaintiff was moved to ransom his property solely by the temptation of his own selfish interest. While we may sympathize with the plaintiff for his plight, we can hardly lend him judicial assistance when to do so would involve so grave an invasion of public policy and the public interest. "Excuse would seldom fail if temptation could supply it." (Union Exch. Nat. Bank v Joseph, 231 N.Y. 250, 254, supra.)
The majority would also exempt a plaintiff in a civil action for damages from testifying as to material facts where he had been subjected to threats and duress. Such an exemption would, in effect, privilege evidence from disclosure. In my view, the creation of such a privilege is both unwarranted and unwise.
The general policy of the law requires that all witnesses fully disclose their knowledge so that justice may prevail. (People ex rel. Mooney v Sheriff of N. Y. County, 269 N.Y. 291, 295.) The CPLR requires that there be full disclosure of all evidence "material and necessary" to the prosecution or defense of action by any party to that action. (CPLR 3101, subd [a], par [1].) This provision should be interpreted liberally, with usefulness and reason supplying the ultimate standard. (Allen v Crowell-Collier Pub. Co., 21 N.Y.2d 403, 406.) In this case, the name of the intermediary, who was an established member of the antique trade, would be essential to verify the fact and amount of payment. If the defendant is, in theory, obligated to indemnify the plaintiff for the ransom payment, the defendant is, at a minimum, entitled to investigate whether the plaintiff, in fact, made the payment he claims to have made. That the plaintiff's personal friend would corroborate the story is hardly an assurance to the defendant.
The granting of a privilege from disclosure creates an exception to the general rule of full disclosure. The question of whether or not additional privileges should be recognized is best left to the judgment of the Legislature. (People ex rel. Mooney v Sheriff of N. Y. County, 269 N.Y. 291, 295, supra.) Suppression of truth is an act which is undertaken only as a "grievous necessity". (McMann v Securities & Exch. Comm., 87 F.2d 377, 378.) This case does not present circumstances so *458 compelling as to warrant this court in proceeding to create a new privilege in the absence of legislative sanction.
The majority contends that there are "exceptional circumstances" which justify the nondisclosure. However, shorn of the public policy question previously discussed, this suit is a relatively uncomplicated civil action for damages. The only exceptional circumstance is that the plaintiff contends that his life, as well as the lives of his family, has been threatened. The plaintiff's remedy, common to all those who would prefer to avoid the rigors, major and minor, attendant to civil litigation, is not to sue. Moreover, although the majority assumes that the plaintiff's claim is sincere, it would be all too simple for such claims to be falsely asserted. While this case may not entail perjury or cynical manipulation, other cases undoubtedly will. The opportunities available for fraud would be greatly enhanced. The law, in setting out its general rules, "looks beyond the specific instance, where the evil may be small or nothing." (Union Exch. Nat. Bank v Joseph, 231 N.Y. 250, 254, supra.) The need to protect the integrity of the judicial system should more than outweigh whatever interest there may be in assisting this particular plaintiff in proving his case.
The holding that the defendant did not adequately preserve his objection to the plaintiff's refusal to disclose is not supported by the record. When the issue as to the identity of the intermediary first arose (while David Keller, a friend of the plaintiff's was testifying), the defendant interposed a timely demand for the intermediary's name. In colloquy between the court and counsel for all parties, the attorney for the defendant told the trial court of his interest in ascertaining the name of the intermediary. "The issue before us now is I have made a demand for the name of the intermediary, the go-between. I believe if I do not have this information, I am substantially prejudiced. I asked Mr. Kraut that information on the examination before trial and received the same statement from him * * * I am now making a formal application to the Judge, to your Honor, and if we do not get it, then I believe there is substantial prejudice, and I want that for the record." The court, after hearing further argument, ruled that the refusal "goes to his credibility, and the weight of the evidence rather than a determination by me that it didn't happen in the first place. That's a question for the jury. I can't grant your motion."
There can be no doubt that the issue was adequately preserved for appellate review. It is no longer necessary for *459 counsel to make formal exceptions to rulings of the court. All that is necessary is that a party make known to the court the action it requests the court to take. (CPLR 4017.) In this case, the defendant advised the court of the requested action, gave the court an opportunity to alter its course, and alerted opposing counsel as to the nature of the objection. (See 4 Weinstein-Korn-Miller, NY Civ Prac, par 4017.04.) It can hardly be said that the defendant failed to press the disclosure issue in light of counsel's stated "demand" for release of the intermediary's name. Since the policy served by requiring that objections be stated has been satisfied, it is pointless, and highly formalistic, to require more.
I conclude that the owner of bailed property should not be permitted to recover a ransom payment from his negligent bailee. Even if such a cause of action may be permissibly asserted, it was error to excuse the plaintiff from disclosing the name of the intermediary. Since my own view is at so substantial a variance with that of the majority, I am compelled to dissent from their decision and would reverse the order of the Appellate Division.
JONES, J. (dissenting).
In my view access to our judicial processes for the recovery of indemnification for ransom moneys paid for the return of stolen property should be denied on grounds of public policy. To that extent I concur in the dissenting opinion of Judge JASEN and would reverse the order of the Appellate Division.
If, however, I were of the view that our courts should be made available for the prosecution of such claims, in the circumstances of this case I would join in the majority opinion. As I read this record, appellant's counsel as a trial tactic chose not to press the disclosure-of-identity issue by requesting the Trial Judge to direct respondent to reveal the name of the go-between on the witness stand. Counsel elected instead to rely on the witness' conspicuous unwillingness to disclose the identity of the alleged go-between to undermine his credibility and thus to raise effective doubt as to whether any ransom money had in fact ever been paid. This trial tactic not having been wholly successful (the jury did award damages of only $45,000 in the face of the claim that ransom had been paid in the amount of $71,000), counsel should not now be heard to argue that the jury's verdict in favor of respondent should be set aside for failure to disclose the name. With the acquiescence of counsel that ultimate issue had never been raised on the trial. On this analysis I do not reach consideration as to *460 what consequence should attend the refusal of a party-witness to answer a relevant question when directed to do so by the court. Nor do I interpret the decision of our court today as creating any new evidentiary privilege.
Order affirmed, with costs.
NOTES
[1] Plaintiff also declined to identify the intermediary in the chambers of the Trial Judge even though it was indicated that he would not be asked to publicly state his name, and even though the Judge cautioned plaintiff that: "[I]f you don't want to divulge the name, then on cross examination they are going to question you to a great extent on this. That would make it, I should think, make it very difficult for the jury to believe that you gave that amount of money, and then refused to name the person to whom you gave it, so I want you to understand the whole situation. Now, if you didn't have that reimbursement cause of action, then nobody would say a word or care who you gave the money to, but when you ask somebody to give you back $71,000.00, that you paid out, you must recognize the fact that they are entitled to know who you paid it to."
[2] In the chambers of the court, plaintiff similarly expressed his fears and added: "[W]e have lived with this horror for three and a half years. On Thursday I went home and I told my wife and children that we had gotten to the point where the name came up. My children said to me, `Dad, Dad, Daddy, Daddy, please don't tell them. Please don't tell them.' They are mortally afraid. Since this occurrence, your Honor, because of her fear for my, her children, my wife has suffered a nervous breakdown. I can't tell you any more than that. I just can't lay their lives on the line anymore. We were a normal family before this happened. None of us are the same any more."
[*] This appeal is limited to only part of the order of the Appellate Division which affirmed the judgment entered on the fourth cause of action (referred to in the judgment as the second cause of action) in the complaint for the recovery of ransom money.