Jones, J.
 

 We conclude that the circumstances disclosed in this record are sufficient to sustain the jury’s verdict that this insurance carrier was liable to its insureds for failure to settle a claim against them within policy limits.
 

 The accident which was the subject of the underlying claim occurred on June 2, 1962. Fred Knobloch was driving an MGA sports car owned by his mother with John A. Wickman as his passenger. The third occupant of the vehicle, a young lady, was sitting on Wickman’s lap. As the car came over a rise while traveling south on the Taconic Parkway and started down the decline, both driver and passenger Wickman observed a rough spot in the road ahead. The car left the southbound lane and overturned, in consequence of which Wickman sustained serious injuries.
 

 In the fall of 1962 Wickman sued both Knoblochs and the East Hudson Parkway Authority, the latter on the theory that a rough section of the parkway had contributed to the accident. Their insurance carrier undertook to defend the action against the Knoblochs. An answer and demand for a bill of particulars were served in December, 1962. The report by the insurance carrier’s physician of his examination of the plaintiff Wickman was received in April, 1963, and the insurance carrier had an examination before trial of Fred Knobloch, the driver, in May of 1963. The carrier was thus informed as to the details of the one-car accident and how it occurred and was aware that in consequence of the accident Wickman had sustained a subluxation involving the fifth and sixth cervical vertebrae and a compression fracture of the fourth dorsal vertebra.
 

 Wickman’s attorney had a conversation with the carrier’s claim adjuster on March 19, 1964, at which time the adjuster confirmed advice previously given that the insurance coverage was limited to $10,000. Wickman’s attorney then stated that he thought his client would release the Knoblochs for $9,500.
 
 *475
 
 The adjuster responded that he would give that figure consideration and asked for particulars of Wickman’s special damages.
 

 The bill of particulars which was not furnished until June, 1965, disclosed further details with reference to the vertebral fracture and dislocation, related injuries and the medical care received, including a claim for permanent loss of approximately
 
 3316%
 
 rotation to the right of neck and head. The bill further revealed that Wickman had been confined to the hospital for 21 days and thereafter at home for approximately six weeks, that he had been involuntarily discharged from the United States Marine Corps Reserve for medical reasons, and that his special damages included hospital and medical expenses of $1,292.30 and loss of earnings totaling $7,590.
 

 On December 15, 1965 Wickman’s attorney had another conversation with the adjuster in the course of which the $10,000 policy limit was again mentioned by the adjuster, and the attorney stated that he was looking for full coverage or close to it. The adjuster this time asked for copies of hospital and medical bills and authorization to obtain hospital records.
 

 In March and September, 1966 the adjuster made telephone calls to the attorney to obtain copies of hospital and medical bills. In February, 1967 the adjuster informed Wickman’s attorney that he was taking up the question of settlement with the carrier’s committee that passed on such matters and would report the best figure. Wickman’s attorney testified that the first offer of settlement which he received from the adjuster came on March 10, 1967 in the amount of $6,500, in response to which the claimant’s attorney restated his $9,500 demand. On February 14, 1968, Wickman’s attorney returned a telephone call left by the adjuster. In the course of that conversation the attorney repeated his $9,500 demand, to which the adjuster said that he had "$8,500 possibly”. The adjuster inquired about $9,000 but the attorney held fast at $9,500. There were no further settlement negotiations until the eve of trial.
 

 Toward the end of 1968, while being interviewed by a representative of the carrier, Knobloch inquired as to demands and offers. The representative then declined to disclose this information on the ground that it was "against company policy”.
 

 On February 15, 1969, the Knoblochs retained independent counsel for their individual protection, and on February 26
 
 *476
 
 their counsel was furnished with copies of all pertinent papers by the insurance carrier. Trial counsel provided by the insurance company for the Knoblochs first saw the file in late February or early March, 1969. The case appeared on the day calendar for March 21, 1969. Wickman’s attorney was in court and, on being informed that the Knoblochs had retained independent counsel, the attorney withdrew his settlement demand of $9,500. On April 9 trial counsel provided by the insurance company called the Knoblochs’ independent counsel, told him that, he was exploring settlement and that the insurance carrier would pay full policy limit. The independent counsel then stated that he was authorized to contribute an additional $2,500 towards a settlement.
 

 The attorneys met to draw a jury on Friday, April 11, 1969. There was. testimony that at that time trial counsel for the Knoblochs told Wickman’s attorney that the adjuster "had foolishly been trying to save * * * a few dollars” on the case and for the first time offered Wickman’s attorney "the full policy of $10,000”. Wickman’s attorney stated that he had withdrawn his demand and accordingly refused the $10,000 offer. On Saturday, April 12, Knobloch authorized his independent counsel to offer as much as $10,000 toward settlement, to bring the total to $20,000.
 

 On Monday, April 14, before the case went to trial, a settlement conference was held before the Trial Judge. The insurance carrier offered its $10,000, independent counsel added $2,500, East Hudson Parkway Authority offered nothing, and Wickman’s attorney then demanded $35,000.
 

 The case went to trial and the jury returned a verdict in favor of Wickman against both the Knoblochs and East Hudson Parkway Authority in the amount of $75,383.50. That judgment, after an unsuccessful appeal
 
 (Wickman v Knobloch,
 
 34 AD2d 617), was thereafter paid, with interest, in equal shares by the Knoblochs and the Parkway Authority, with the insurance carrier contributing $10,000 (plus interest and costs) to the Knobloch share.
 

 The Knoblochs then instituted the present action against their insurance carrier alleging bad-faith failure on the part of the carrier to settle the Wickman action within policy limits, thereby exposing the Knoblochs to excess liability and associated expenses. After trial in this second action the jury returned a verdict in favor of the Knoblochs against the
 
 *477
 
 insurance company in the amount of $30,236.50, representing the amount above $10,000 which the Knoblochs had been obliged to pay Wickman. The Appellate Division reversed and dismissed Knobloch’s complaint. We now reinstate the jury verdict with interest.
 

 The issue on this appeal is much narrower than might be assumed. There is no claim of evidentiary error. The Trial Judge told the jury that, "We do not have any specific definition in our law as to what indicates or evidences bad faith. * * * It would be for you as a jury panel to determine whether or not the conduct of the parties in this action indicates the presence of bad faith as alleged by the plaintiffs in failing to bring about a settlement within the policy limits”. The crucial portion of the charge to the jury was as follows: "Thus, the law imposes upon the insurer—in this instance, the Royal Globe Insurance Company—the obligation of good faith—basically, the duty to consider, in good faith, the insureds’ interests,as well as its own when making decisions as to settlement.” No exception was taken to this charge and it thereby became the law of this case.
 
 *
 
 The sole issue tendered for our review, therefore, is whether there was sufficient evidence in this record, viewed most favorably to the insureds, to sustain the jury verdict in their favor—i.e., was a prima facie case made out under the charge as given. There is no occasion to consider whether the standard laid down by the trial court for the determination of bad faith on the part of the carrier in failing to settle within policy limits is legally correct, and we leave that issue for address in another case,
 
 *478
 
 intending here to intimate no view with respect to the charge given in this case.
 

 It serves first, and in reverse chronological order, to dispose of two issues which have been pressed on us by counsel for the insurance carrier but which we conclude are immaterial in the circumstances of this case.
 

 In the first place, it is urged that the conceded failure of the insured’s independent counsel to offer the full $10,000 authorized by the insureds should be considered on the issue of bad faith. We think this contention wholly diversionary in the circumstances disclosed, in this record. Even if it were to be recognized,
 
 arguendo,
 
 that it might be material on an issue of causation or of mitigation of damages to show that Wickman’s claim could have been settled had the full authorized independent contribution been offered, there is here no proof or inference available that such would or even might have been the case in this instance. The record discloses only that Fred Knobloch authorized the additional $10,000 on the Saturday before trial, at which time Wickman’s $9,500 demand had already been withdrawn. At the settlement conference before the Trial Judge on the following Monday morning, it is not disputed that the Wickman demand had gone to $35,000. To argue that had Knobloch’s independent counsel then offered his full additional $10,000 rather than only $2,500, the case could have been settled for a total of $20,000 is only to invite the sheerest speculation.
 

 In the second place, counsel for the insurance carrier argues vigorously that the ultimate tender of full policy limits on the eve of trial automatically insulates the carrier from any liability for bad faith failure to settle within policy limits, whatever the standard for determining bad faith. We reject any such contention. We agree that such an offer whenever made is relevant and material both to the basic issue of bad faith and as well to the question whether refusal to tender full policy coverage was the cause of the failure to settle within policy limits. We do not agree, however, that such a belated tender would always operate without more to exonerate a carrier from a pre-existing liability for bad-faith failure to settle within policy limits. Counsel for the insurance carrier invites our attention to no case which has ever so held, in our jurisdiction or elsewhere. Again here, without exception thereto being taken, the trial court, referring to the carrier’s final tender of the full $10,000 on the eve of trial, charged the
 
 *479
 
 jury specifically: "The question for you to ultimately determine is whether or not the defendant in this case evidenced bad faith in not having settled the case
 
 prior to that time
 
 within the limits of the policy.” (Emphasis added.)
 

 We turn then to what we think is the core issue of this appeal—was the evidence, viewed in the light most favorable to the Knoblochs, the insureds, sufficient to sustain the jury verdict in their favor under the standard of bad faith laid down by the trial court without objection. We observe that the court did not charge the jury, for instance, that "bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract”
 
 (Gordon v Nationwide Mut. Ins. Co.,
 
 30 NY2d 427, 437), nor was any such charge requested. Similarly other cases cited by counsel for the insurance carrier in which there was imposed a more stringent standard than that invoked by the trial court here are irrelevant to the disposition of this appeal.
 

 We return to our early point of departure. Under the standard which became the law of this case, the test was whether the insurer in good faith considered "the insureds’ interests as well as its own when making decisions as to settlement”. We view the evidence then from that perspective.
 

 Initially certain propositions should be stated, or restated. The fact that the demand at one time was below $10,000 and thus that there could have been a settlement within policy limits surely is not sufficient to fasten liability on the carrier. Equally obvious, we suggest, is the corollary principle that an insurance carrier is not obligated to settle within coverage limits merely because an opportunity to do so is presented. Nor was the carrier obligated to consult its insured in regard to settlement. We are of the view, however, that the carrier is obliged in most circumstances to respond accurately to requests from its insured with reference to the progress of any settlement negotiations. In this view we think the 1968 refusal of this carrier’s representative, on the grounds of company policy, in response to Knobloch’s direct inquiry to disclose "how much was being asked and how much was being offered” was relevant on the issue of bad faith, although we would attach little significance to it, standing alone.
 

 The jury here was entitled, and indeed obligated, to make its own evaluation of the failure of this carrier to settle. In major part it was called on to make its own assessment of the Knobloch claims. On the issue of liability we take it that the
 
 *480
 
 conceded facts of this one-car accident would be sufficient to warrant an expectation that in an action by a passenger any jury would be more than likely to have found negligence on the part of the driver. The only issue on this branch would be the possibility that Wickman’s awareness of the speed at which the sports car was traveling and his visual perception of the rough spot in the highway immediately prior to the accident might have been the basis for a finding of contributory negligence on his part, which at the time of this trial in 1969 would have defeated his claim. In our view a finding of contributory negligence of a passenger in these circumstances could be characterized at best as highly problematical. There is no issue as to causation.
 

 Moving from the issue of liability to that of damages, it is our view a jury would be entitled to conclude here that, if liability were found, damages would almost certainly far exceed $10,000 in the light of the serious injuries sustained by Wickman, the claim of some degree of permanence, the nature and extent of the hospital and medical care rendered, the restriction of activity, the alleged consequences of the injuries, and the amounts of special damages for hospital and medical care and for lost earnings.
 

 We observe that no proof was offered by the carrier either of any evaluation of the case for settlement purposes on its part by its own personnel or by qualified outsiders or of any advice with reference to settlement appraisal solicited or received from counsel (cf., e.g.,
 
 Gordon v Nationwide Mut. Ins. Co., supra;
 
 but cf.
 
 Decker v Amalgamated Mut. Cas. Ins. Co.,
 
 35 NY2d 950).
 

 We conclude that, under the standard for the determination of bad faith laid down by this trial court and accepted by the parties, the jury was warranted here in finding the insurance carrier liable for failure to settle the Wickman claim within policy limits. Accordingly, the order of the Appellate Division should be reversed, and the judgment of Supreme Court in favor of the insureds reinstated, with interest.
 

 Chief Judge Breitel and Judges Jasen, Gabrielli, Wachtler, Fuchsberg and Cooke concur.
 

 Order reversed, with costs, and judgment and order of Supreme Court, Queens County, reinstated.
 

 *
 

 Counsel for the insurance carrier did take exception to the trial court’s statement that there is no legal definition of bad faith. The following colloquy then ensued: "The Court: 'Can you give me the authority and the indication of where the law specifically sets forth the definition?’ [counsel for the carrier]: T am not prepared at this time to give that to your Honor.’ ” In addition defense counsel submitted seven written requests to charge, each of which, in our opinion, was properly denied. Only the fifth such request warrants any attention. By that request, a charge was sought in effect that bad faith does not include negligent conduct. We concur in the dispositive statement of Mr. Presiding Justice Frank A. Gulotta, in his dissenting opinion at the Appellate Division: "In a case where an issue as to negligence has been developed for the jury, I agree that such a request would be appropriate and proper, but in the posture of this case, where there had been no claim of negligent conduct on the part of the defendant, such as failure to properly investigate the case, or try it, or the like, but rather a deliberate decision' to ignore the interests of the assured and to consider only its own, the request to charge the effect of negligence was irrelevant and was properly refused.” (46 AD2d, at p 297.)
 

 In any event, no point is made on the present appeal on behalf of the insurance carrier that the jury verdict was based on erroneous instructions by the trial court.