FRANK PAVIA, Respondent, et al., Plaintiffs, v STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant.

Second Department, October 26, 1992

## APPEARANCES OF COUNSEL

*Rivkin, Radler, Bayh, Hart & Kremer,* Uniondale *(Edward J. Hart, Evan H. Krinick, Matthew Jay Weiss* and *John M. Denby* of counsel), for appellant.

*Schapiro & Reich,* Lindenhurst *(Steven M. Schapiro* and *Perry S. Reich* of counsel), for respondent.

## OPINION OF THE COURT

THOMPSON, J. P.

■ The principal question before us is whether the evidence adduced at the trial established that the defendant insurance carrier acted in "bad faith" by allegedly failing to act within a reasonable time upon a settlement offer made by the plaintiff Frank Pavia's attorney in the underlying personal injury action. For the reasons that follow, we conclude that the jury could properly have found that the carrier acted in bad faith, and accordingly, affirm the judgment appealed from.

### I

During the evening hours of April 19, 1985, then 16-year-old Carmine Rosato was operating a 1978 Pontiac Grand Prix owned by his mother Joanne Rosato and insured by the defendant State Farm Mutual Automobile Insurance Company. Carmine Rosato, who had only a learner's permit which did not authorize night driving, picked up 19-year-old Frank Pavia and a second youth, and began "driving around" the Bensonhurst section of Brooklyn.

At approximately 10:15 P.M., Rosato made a right turn from Stillwell Avenue onto 23rd Avenue, where he encountered a

double-parked car, which apparently caused him to lose control of his vehicle. Rosato's car spun out of control towards the opposite side of 23rd Avenue, where it struck a parked car and then fishtailed toward the nearby intersection of 23rd Avenue and 79th Street. A second violent impact occurred when Rosato's car swerved into the northbound lane of oncoming traffic on 23rd Avenue and collided with a vehicle operated by Joseph Amerosa.

As a result of the collision, Frank Pavia, who had been a passenger in the rear of the Rosato vehicle, sustained serious injuries, including permanent brain damage, and remained in a coma for approximately three weeks after the accident occurred. Although Pavia ultimately regained consciousness, he was rendered a hemiplegic, suffering permanent paralysis of the right side of his body. In 1985 authorizations for Pavia's medical records had been given to the Rosatos' carrier, the defendant State Farm Mutual Automobile Insurance Company (hereinafter State Farm), in connection with Pavia's "no fault" application. By early 1986, State Farm's $50,000 no-fault coverage had been exhausted in the payment of Pavia's medical bills.

## II

In October 1985 Pavia commenced an action against Carmine Rosato, Joanne Rosato, and Joseph Amerosa, to recover damages for personal injuries. John F. Picciano was retained by State Farm to represent the Rosatos. At a discovery conference held in March 1987 the parties were directed to exchange medical information and Pavia's attorney, Richard Sgarlato, was ordered to make Pavia available for medical examination by the defendants in the personal injury action. Earlier, in August 1986, Mr. Sgarlato had provided State Farm claims personnel assigned to the case with medical reports written by two of Pavia's treating physicians. These reports stated, *inter alia,* that Pavia had "sustained permanent loss of the use of his entire right upper and lower extremities * * * and permanent loss of his ability to speak and to stand up * * * the results of severe brain damage sustained in the accident". Two physicians retained by State Farm and Amerosa's carrier—GEICO—subsequently examined Pavia in April 1987 and filed reports which essentially confirmed the serious and permanent nature of Pavia's injuries.

## III

In June 1986, State Farm assigned the Pavia matter to John A. Pellegrino, the claims representative who was to be primarily responsible for handling the case on a day-to-day basis. Prior thereto, the case had been handled by a so-called "line unit" representative, whose duty it was to conduct an initial investigation of the claim. In August 1985 Carmine Rosato had given the "line unit" representative a statement indicating that he had lost control of his vehicle just as he turned onto 23rd Avenue and encountered a double-parked car. Rosato further stated that he was traveling at "around thirty-five" miles per hour in a 30-mile-per-hour zone.

The police report filed in connection with the accident mentioned three possible witnesses, but State Farm ultimately ascertained in early 1986 that two of these individuals had not actually observed the accident. The third witness whom State Farm contacted indicated that she would not cooperate with any investigation, but did state "off the record" that Rosato was "flying" prior to the accident, that he took the turn "too fast", causing him to lose control, and that he was traveling at a speed of about 50 miles per hour. The police report similarly quotes an unnamed witness as stating that Rosato's vehicle was "travelling at a high rate of speed". In March 1986 the "line unit" representative authored a report which concluded that the Rosatos' liability was 100%, an assessment "basically concurr[ed]" in by the representative supervisor at the time.

On June 9, 1987, Carmine Rosato was deposed. In his deposition, Rosato stated for the first time that the automobile which he claimed to have encountered upon turning onto 23rd Avenue was "backing up" and that he had maneuvered in order to avoid it prior to losing control of his car. By letter dated June 10, 1987, the Rosatos' attorney, Mr. Picciano, who had attended the deposition, informed State Farm, *inter alia,* that Pavia appeared to be in "extremely bad shape" and that liability also appeared to be "extremely unfavorable". Counsel further advised that "[i]f plaintiff's [Pavia's] claims are accurate, I would recommend reserving $100,000.00 to avoid a potential bad faith claim".

## IV

On June 26, 1987, Pavia's attorney, Mr. Sgarlato, sent State Farm a so-called "demand letter" indicating that he was willing to settle the case provided that the carrier tender the

full amount of its policy, i.e., $100,000. The letter, which also listed Mr. Picciano's name as an addressee, contained a provision stating, in relevant part that, "[t]his offer to settle for the full amount of the policy ($100,000) shall expire thirty (30) days from the date of receipt of this letter". An identical letter was sent to GEICO—codefendant Joseph Amerosa's carrier—demanding tender of its full $10,000 policy amount. The demand letters did not contain the file numbers or the names of the claims representatives who had been assigned to the case by the respective carriers. It is undisputed, however, that State Farm received its letter on June 29, 1987, and that Mr. Pellegrino ultimately received it on July 9, 1987.

Although Mr. Pellegrino stated that an offer to settle within the $100,000 policy limits would be a "significant" development in a potential multimillion dollar case where both liability and the insured's potential exposure appeared substantial, neither he nor anyone else from State Farm responded to the "timed" settlement offer. According to Mr. Picciano's testimony, State Farm claims personnel never informed him that the demand letter had been received or attempted to discuss with him the implications of the settlement overture. Mr. Picciano apparently first learned that the settlement offer had been made in early January 1988 when Pavia's attorney showed him a copy of the demand letter at a court conference. The Rosatos were never informed by State Farm that an offer to settle the action within the policy limits had been made.

After receipt of the demand letter, a period of several months elapsed before State Farm ultimately convened a so-called "claim committee" meeting of senior personnel to consider the Pavia lawsuit. Immediately prior to this meeting, which took place on December 1, 1987, Mr. Pellegrino had completed a handwritten "rough draft" outlining his assessment of the case for the claim committee. The claim committee included at least two "claim superintendents", among them Linda Cooper, and a "divisional claim superintendent", Vincent Rizzo, who had the power to authorize settlement of the case up to the policy amount. At the meeting, which lasted approximately 35 minutes, it was determined that Mr. Picciano would be authorized to offer up to the full $100,000 policy amount. A subsequent, "finished" claim committee report dated December 16, 1987, recommended that State Farm make the "best settlement to $100,000 [for] our share * * * at trial". The report further concluded that the "insured appeared to be at least 80% culpable". Another month

elapsed, however, before the offer was orally communicated to an associate of Pavia's counsel at a court conference which took place on January 7, 1988. Counsel rejected the offer a few days later, stating, *inter alia,* that State Farm's failure to timely respond to his settlement offer was a principal reason underlying his decision.

At the trial, evidence was introduced establishing that the State Farm claims manual in effect at the time the demand letter was received required claims personnel who receive a demand letter with a time limit to consult "immediately" with the divisional claim superintendent. Mr. Rizzo testified at trial that in his capacity as divisional claim superintendent, he had orally rescinded this portion of the manual due to the large number of demand letters received in the New York area. Mr. Rizzo further testified, however, that no written document memorializing this modification of the claims manual existed. The relevant portion of the claims manual concerning demand letters with a time limit stated that "[w]hen such a time limit demand is received—oral or in writing—it is imperative that it be transmitted to the Superintendent immediately—the same day, if possible". The manual further provided that "[u]pon receipt of the time limit demand from the claims representative, the Superintendent must review the file and immediately advise and consult with the Divisional Claim Superintendent. Thereafter, the Divisional Claim Superintendent will periodically follow up with the Claim Superintendent to insure proper handling".

Prior to attending the claim committee meeting, neither Ms. Cooper nor Mr. Rizzo was aware that the demand letter had been received. Moreover, Ms. Cooper testified that she only became aware that the demand letter existed a month later, in January 1988, when the Rosatos' attorney reported that the offer had been rejected by Pavia's counsel because no response had been received from State Farm. Mr. Rizzo stated that upon reviewing the file at the claim committee meeting, he had noticed the demand letter and was aware that it contained a time limitation. He recalled, however, that he did not discuss the letter with the other members of the committee, and assigned no particular materiality or urgency to its presence in the file or to the fact that the settlement offer had long since expired.

## V

The Pavia personal injury action ultimately went to trial in

March 1988. The jury returned a verdict for Pavia in the principal amount of $6,322,000, which was subsequently reduced, upon State Farm's motion, to $5,000,000, the sum demanded in the ad damnum clause, which was 50 times greater than the $100,000 policy limit. The jury attributed 85% of the fault in the happening of the accident to Carmine Rosato, and 15% to Joseph Amerosa. This Court subsequently modified the judgment by directing a new trial as to damages unless Pavia stipulated to a further reduction in the verdict to $3,880,000 (see, Pavia v Rosato, 154 AD2d 519). In April 1988 the Rosatos assigned "all causes of action" they might have against State Farm to Frank Pavia. Pavia, together with the Rosatos, then commenced the instant action, alleging, inter alia, that State Farm had acted in "bad faith" and in reckless disregard of the Rosatos' interests by failing to settle the claim within the $100,000 policy limit when the opportunity to do so had arisen.

After a trial, the jury found that State Farm had acted in bad faith with respect to the handling of the claim. The issue of damages was not submitted to the jury, however, since the trial court ruled as a matter of law that the damages would represent the amount by which the personal injury judgment —as modified by this Court—exceeded the Rosatos' $100,000 policy, plus interest on this amount from the date of the verdict in the personal injury action. A judgment in the amount of $4,688,030, which included interest from the date of the verdict in the personal injury action, was subsequently entered against State Farm.

On appeal,[1] State Farm argues, inter alia, that the evidence adduced at trial was insufficient as a matter of law to establish its "bad faith" in handling the Rosatos' claim, or that the jury's verdict is against the weight of the evidence, that the court erred in its charge to the jury concerning the definition of bad faith, and that, since the Rosatos were allegedly insol-

1. The appeal from the judgment brings up for review the denial of an earlier motion made by State Farm for summary judgment dismissing the complaint (see, CPLR 5501 [a] [1]; Matter of Aho, 39 NY2d 241, 248). The denial of this motion was proper inasmuch as the record demonstrates the existence of material questions of fact precluding any award of summary judgment (see, Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067-1068). We note further that since bad-faith claims are often proven largely through circumstantial evidence, courts are generally reluctant to dismiss complaints alleging bad faith at the pretrial stage (see, Roldan v Allstate Ins. Co., 149 AD2d 20, 37-38; see also Decker v Amalgamated Mut. Cas. Ins. Co., 35 NY2d 950, 952-953).

vent, they suffered no harm "as a matter of law" by virtue of the judgment against them in excess of the policy limit, mandating dismissal of the complaint.

## VI

██ We reject State Farm's assertion that the court committed reversible error in its charge to the jury with respect to the definition of "bad faith". Tracking the charge contained in the Pattern Jury Instructions and language recently approved by this Court *(see,* PJI 4:67 [Supp]; *Roldan v Allstate Ins. Co.,* 149 AD2d 20, 37, *supra; DiBlasi v Aetna Life & Cas. Ins. Co.,* 147 AD2d 93, 99), the Trial Justice instructed the jury that State Farm's alleged bad faith could not be premised upon mere negligence, carelessness, or an "error in judgment". The court informed the jury that in order to find "bad faith" it must conclude that State Farm acted "intentionally and in gross disregard of the Rosatos' interest", and further, that there "was a deliberate or reckless decision" to disregard the Rosatos' interests in pursuing its litigation strategy. The foregoing charge adequately conveyed to the jury the applicable principles relevant to the assessment of a bad-faith claim *(see, DiBlasi v Aetna Life & Cas. Ins. Co., supra; Roldan v Allstate Ins. Co., supra; see also, Dano v Royal Globe Ins. Co.,* 59 NY2d 827, 829; *Hartford Ins. Co. v Methodist Hosp.,* 785 F Supp 38, 40). State Farm nevertheless argues that the Court of Appeals in *Gordon v Nationwide Mut. Ins. Co.* (30 NY2d 427, 437, *cert denied* 410 US 931), defined "bad faith" as requiring a showing of a "disingenuous or dishonest failure" to carry out the insurance contract, a standard State Farm narrowly construes as including only conduct which derives from a dishonest motive or constitutes a "deceitful misdeed". We disagree.

██ In *Roldan v Allstate Ins. Co. (supra),* we discussed the language contained in *Gordon (supra),* upon which State Farm relies, and the "gross disregard" standard, as essentially complementary statements of the bad-faith principle, rather than as mutually exclusive or conflicting statements of law *(Roldan v Allstate Ins. Co.,* 149 AD2d 20, 27, *supra).* Moreover, in *DiBlasi,* we emphasized that the "standard is not that of ' "a sinister motive—guilty knowledge—an intent to do harm or deprive another of his just rights and property" ' " but rather, whether the conduct in question constituted a "gross disregard of its insured's interests" *(DiBlasi v Aetna Life &*

*Cas. Ins. Co.,* 147 AD2d 93, 98, 99, *supra,* quoting from *Cappano v Phoenix Assur. Co.,* 28 AD2d 639, 640). We see no reason to depart from our recent holdings by narrowing the definition of "bad faith" so as to exclude from its reach all but intentional or deceitfully undertaken actions *(see, DiBlasi v Aetna Life & Cas. Ins. Co.,* 147 AD2d 93, 98, *supra; Cappano v Phoenix Assur. Co., supra).* Our construction of the bad-faith principle is supported by the holding of the Court of Appeals in *Dano v Royal Globe Ins. Co.* (59 NY2d 827, 830, *supra),* where the Court, citing *Gordon,* specifically indicated that a carrier's "gross disregard" of an insured's rights constituted "an essential element of such cause of action" *(cf., Gordon v Nationwide Mut. Ins. Co., supra,* at 431). In light of the foregoing, we conclude that the court's charge concerning the concept of "bad faith" was proper.[2]

## VII

■ Similarly without merit is State Farm's claim that the evidence adduced at the trial was insufficient as a matter of law to present a question for the jury's resolution with respect to its "bad faith" in failing to make timely efforts to settle the action within the policy limits. Nor do we agree, as State Farm alternatively contends, that the jury's verdict was against the weight of the evidence *(see, Cohen v Hallmark Cards,* 45 NY2d 493, 499; *Meiselman v Allstate Ins. Co.,* 166 AD2d 562, 563; *Nicastro v Park,* 113 AD2d 129).

As we have recently observed, " '[b]ad faith " 'is generally proven by evidence largely circumstantial in nature' " ' " *(Roldan v Allstate Ins. Co., supra,* at 37). "A bad faith case is established where the liability is clear and the potential recovery far exceeds the insurance coverage" *(DiBlasi v Aetna Life & Cas. Ins. Co.,* 147 AD2d 93, 98, *supra).* Although to be sure, a carrier's failure to act within a 30-day settlement

---

2. ■ We also disagree with State Farm's assertion that it was entitled to have the jury charged with respect to its speculative allegation that it had been deliberately "set up" by Pavia's attorney, i.e., its claim that Pavia's attorney never intended to accept even a reasonably timely offer of the $100,000 policy limit and that he purposely made his offer so that it would expire before State Farm could conduct a meaningful and complete investigation of the claim. We agree that the proper focus of the jury's attention was State Farm's conduct in handling the claim, not counsel's underlying or undisclosed motives in making the settlement offer. In any event, the jury was free to reject the "bad faith" claim within the parameters of the charge given if it was of the view that the demand letter prematurely imposed unreasonable conditions.

deadline—or any stated time period—is not dispositive of its bad faith *(cf., Knobloch v Royal Globe Ins. Co.,* 38 NY2d 471, 479), the law nevertheless imposes on the carrier the obligation of good faith, "which is basically the duty to fairly consider the insured's interests as well as its own in making the decision as to settlement" *(DiBlasi v Aetna Life & Cas. Ins. Co., supra,* at 99). Significantly, the Court of Appeals has rejected the contention that a belated offer of the full policy amount will automatically insulate a carrier from all liability based upon a claim of bad faith *(see, Knobloch v Royal Globe Ins. Co., supra,* at 478; *see also, Reifenstein v Allstate Ins. Co.,* 92 AD2d 715, 716; *Hartford Ins. Co. v Methodist Hosp.,* 785 F Supp 38, 39-41, *supra).*

The trial record supports the inference that State Farm's claims personnel had adopted an attitude of complete indifference to Pavia's settlement overture, literally ignoring the demand letter for months without so much as even acknowledging that it had been received *(cf., Hartford Ins. Co. v Methodist Hosp., supra; Young v American Cas. Co.,* 416 F2d 906, 910-911). Moreover, the jury reasonably could have declined to credit State Farm's assertion that the delay was necessary to gather additional information in order to confirm the attractiveness of an offer to settle a potential $1,000,000 claim within the Rosatos' $100,000 policy limit. Indeed, there was credible evidence adduced at the trial establishing that State Farm claims personnel possessed the information necessary to accurately assess both the magnitude of Frank Pavia's injuries and the Rosatos' potential exposure well before the June 26, 1987 settlement offer was received. Further, Carmine Rosato's deposition testimony neither altered State Farm's original assessment of its insured's substantial culpability nor provided a rationale for simply failing to react to Pavia's settlement offer. We note in this respect that the day after the deposition had been completed, and approximately a month before the demand letter was received on July 9, 1987 by Mr. Pellegrino, the Rosatos' attorney was able to summarize Carmine Rosato's deposition by advising State Farm that liability appeared to be "extremely unfavorable". Under the circumstances, we cannot say that there existed "no valid line of reasoning and permissible inferences" which could possibly lead rational people to the conclusion reached by the jury *(Kulak v Nationwide Mut. Ins. Co.,* 40 NY2d 140, 143; *Knobloch v Royal Globe Ins. Co.,* 38 NY2d 471, 479, *supra; Cohen v Hallmark Cards, supra,* at 499). Nor can it be said that " 'the

jury could not have reached the verdict on any fair interpretation of the evidence' " *(Nicastro v Park,* 113 AD2d 129, 134, quoting *Delgado v Board of Educ.,* 65 AD2d 547, *affd* 48 NY2d 643).

## VIII

■ State Farm further maintains that since the Rosatos were "insolvent" and unable to pay any significant portion of the underlying personal injury judgment, they did not, as a matter of law, sustain any legally compensable damages, mandating dismissal of the complaint. We disagree. Under the circumstances presented, the Trial Justice properly concluded that State Farm was liable for the difference between the underlying personal injury judgment and the $100,000 policy limit.

It is settled in New York that with respect to a solvent insured, the measure of damages in a bad-faith case is the amount by which the judgment in the underlying tort action exceeds the insured's policy coverage *(see, DiBlasi v Aetna Life & Cas. Ins. Co.,* 147 AD2d 93, 101, *supra; Levantino v Insurance Co.,* 102 Misc 2d 77; *see also, Roldan v Allstate Ins. Co., supra; Hartford Ins. Co. v Methodist Hosp., supra,* at 40). Indeed, "[r]egardless of the insured's financial responsibility most courts automatically adopt the excess judgment as the measure of damages in the insured's [bad-faith] contract action" *(Gordon v Nationwide Mut. Ins. Co.,* 30 NY2d 427, 448, *supra* [Breitel, J., dissenting]). We see no reason to depart from the above method of calculating damages.

It is true, as State Farm contends, that in the case of an insolvent insured or an insured with limited economic means, some courts and commentators have questioned whether the full extent of the excess judgment should serve as the measure of damages *(Gordon v Nationwide Mut. Ins. Co., supra,* at 441-453 [Breitel, J., dissenting]; *Harris v Standard Acc. & Ins. Co.,* 297 F2d 627, *cert denied* 369 US 843; *Levantino v Insurance Co., supra,* at 85-88; 2 NY PJI 358 [1991 Supp]; *cf., Roldan v Allstate Ins. Co., supra,* at 43; Keeton and Widis, Insurance Law § 7.8 [i], at 898-899 [1988]). The foregoing view rests, in general, upon the presumption that an insured who is incapable of paying the excess judgment has sustained no legal injury and that to permit full recovery of the excess judgment would constitute a windfall *(see, Levantino v Insurance Co., supra,* at 82). We decline to adopt this approach in the case at bar.

Although the Rosatos lacked the resources to pay any significant portion of the excess judgment, we reject the suggestion that they were not harmed by the entry of such a large excess judgment. As was well stated by the Court in *Henegan v Merchants Mut. Ins. Co.* (31 AD2d 12, 13), "[r]eason as well as economic fact dictates that the mere existence of an excess final judgment causes harm to the judgment debtor. The judgment increases his debts, it damages his credit, it subjects his property to the lien of the ubiquitous judgment". In any event, the evidence contained in the record does not establish that the Rosatos were financially "insolvent" to the extent that they would suffer no harm by virtue of the judgment.

Nor do we agree that, under the circumstances presented, the proper measure of damages is the extent to which the Rosatos' assets "were likely to be endangered by the judgment"—the standard proposed by State Farm in its preliminary requests to charge. Having shackled its insured with a massive excess judgment, a faithless carrier should not be permitted to avoid liability by arguing that its insured's assets have not been sufficiently damaged by the existence of the judgment *(cf., Henegan v Merchants Mut. Ins. Co., supra,* at 13). Moreover, the adoption of such a damages standard would reward a carrier which has breached its duty to act in good faith, since, in the case of an impecunious insured, the carrier's liability in any "bad faith" case would be governed not by the amount of the resulting excess judgment, but rather by the measure of its insured's limited economic worth *(cf., Levantino v Insurance Co.,* 102 Misc 2d 77, 82, *supra).*

State Farm's reliance upon dictum in *Gordon v Nationwide Mut. Ins. Co.* (30 NY2d 427, *supra),* to support its view that the trial court used an erroneous measure of damages is misplaced. In *Gordon,* the Court of Appeals dismissed the plaintiff's complaint after concluding that bad faith had not been established, and did not reach any issue relating to the calculation of damages. The concurring and dissenting opinions did, however, address the issue of damages. Chief Judge Fuld's concurring opinion posited the view that no damage had been sustained by the insured as a matter of law in light of the insured's insolvency and failure to participate in the proceedings *(Gordon v Nationwide Mut. Ins. Co., supra,* at 439-441), while Judge Breitel's dissent alternatively proposed a method of calculating damages involving an insolvent insured based upon a consideration of various economic factors "rea-

sonably predictive of the insured's economic future" *(Gordon v Nationwide Mut. Ins. Co., supra,* at 451). The *Gordon* dictum, however, has not been adopted by the Court of Appeals. In any event, the facts at bar are clearly distinguishable from the extreme circumstances presented in *Gordon.* In *Gordon,* the insured, who had defaulted during the underlying personal injury action and whose whereabouts subsequently remained unknown, possessed no assets other than his eight-year-old automobile which had been involved in the accident. Accordingly, the insured possessed neither the "interest" nor "motivation to prevent entry of a judgment in excess of policy limits" *(Gordon v Nationwide Mut. Ins. Co., supra,* at 440 [Fuld, Ch. J., concurring]). In short, under the circumstances presented, the *Gordon* dictum does not support State Farm's contentions of error with respect to the calculation of damages.

We have reviewed State Farm's remaining contentions and find them to be without merit.

Accordingly, the judgment is affirmed, with costs.

MILLER, COPERTINO and PIZZUTO, JJ., concur.

Ordered that the judgment is affirmed, with costs.