■ JENNIFER M. DOHERTY and Another, as Assignees of Thomas S. Fitzpatrick, Appellants, v MERCHANTS MUTUAL INSURANCE COMPANY, Respondent. [903 NYS2d 836]—

Appeal from an order of the Supreme Court, Erie County (Penny M. Wolfgang, J.), entered October 2, 2008. The order granted defendant's motion for summary judgment dismissing the complaint.

It is hereby ordered that the order so appealed from is affirmed without costs.

Memorandum: Plaintiffs, as assignees of Thomas S. Fitzpatrick, the defendant in the underlying personal injury action, commenced this action alleging that defendant acted in bad faith by failing to settle the underlying action and thereby exposing Fitzpatrick to personal liability. Plaintiffs commenced the underlying action seeking damages for injuries sustained by Jennifer M. Doherty (plaintiff) when the vehicle she was operat-

ing was rear-ended by a vehicle operated by Fitzpatrick. The jury awarded plaintiffs damages in excess of the coverage that Fitzpatrick had pursuant to his insurance policy with defendant and, in this action, plaintiffs seek damages in the amount of the difference between the verdict and the policy limit. Supreme Court (Wolfgang, J.) granted defendant's motion seeking summary judgment dismissing the complaint. We affirm.

"To prevail in . . . an action [seeking damages for an insurer's bad faith refusal to settle an underlying action], a plaintiff must establish that the insured lost an actual opportunity to settle the . . . [action] . . . at a time when all serious doubts about [his or her] liability were removed . . . , and that defendant insurer [acted with gross disregard for the insured's interests, i.e., it] engaged in a pattern of behavior evincing a conscious or knowing indifference to the probability that [the] insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted" (*Kumar v American Tr. Ins. Co.*, 57 AD3d 1449, 1450 [2008] [internal quotation marks omitted]; *see Pavia v State Farm Mut. Auto. Ins. Co.*, 82 NY2d 445, 453-454 [1993], *rearg denied* 83 NY2d 779 [1994]). In the underlying action, Supreme Court (Curran, J.) denied Fitzpatrick's motion seeking summary judgment dismissing the complaint based in part on its determination that plaintiffs raised a triable issue of fact whether plaintiff sustained a serious injury within the meaning of Insurance Law § 5102 (d), and the court granted plaintiffs' cross motion seeking partial summary judgment on the issue of Fitzpatrick's negligence.

It is undisputed that, prior to the trial of the underlying action, the attorneys for plaintiffs and Fitzpatrick requested that defendant settle the underlying action for the policy limit of $300,000. Nevertheless, "[i]t is settled that an insurer 'cannot be compelled to concede liability and settle a questionable claim' . . . simply 'because an opportunity to do so is presented' " (*Pavia*, 82 NY2d at 454). In support of its instant motion, defendant established that it investigated the claim in the underlying action and arranged for a physical examination of plaintiff to determine the extent of her alleged injuries and whether they constituted a serious injury. Although the expert retained by defendant and plaintiff's treating physician had differing views with respect to the extent of plaintiff's injuries, the expert determined that plaintiff sustained cervical, thoracic and lumbar strains that resulted in a "moderate, partial, temporary disability for recreational activities and activities of daily living in the home." Defendant's investigation included a videotape of

plaintiff engaged in activities without apparent difficulty, despite her alleged injuries. Defendant further established that it participated in settlement negotiations prior to and during the trial and that Supreme Court (Curran, J.) was actively engaged in the settlement negotiation process. Prior to trial, plaintiffs reduced their demand to $250,000 and, during the trial, they further reduced their demand to $240,000. Defendant thereafter increased its settlement offer from $25,000 to $55,000. Furthermore, the internal records of defendant submitted in support of the instant motion establish that the "high-low" offer that it made after the trial commenced was "not well received," and plaintiffs' attorney testified at his deposition that the "high-low" offer was rejected.

We conclude that defendant established that Fitzpatrick did not lose an actual opportunity to settle the claim at a time when all serious doubts about his liability were removed and it was clear that the potential recovery far exceeded the insurance coverage (see id.), and thus that it did not act with gross disregard for Fitzpatrick's interests (see id. at 453). We therefore conclude that defendant established its entitlement to summary judgment dismissing the complaint, and that plaintiffs failed to raise a triable issue of fact in opposition (see generally Zuckerman v City of New York, 49 NY2d 557, 562 [1980]).

All concur except Centra and Carni, JJ., who dissent and vote to reverse in accordance with the following memorandum.

Centra and Carni, JJ. (dissenting). We respectfully dissent and begin our analysis with the well-settled proposition that a jury question exists in most cases where the issue is whether an insurer's good faith obligation has been met (see 2 NY PJI2d 4:67, at 1016 [2010]). Bad faith is generally proven by evidence largely circumstantial in nature (see Cappano v Phoenix Assur. Co. of N.Y., 28 AD2d 639 [1967]). Like many other actions involving bad faith, it is a rare occasion to uncover a "smoking gun" and instead the proof of these cases requires the careful and collective evaluation of a confluence of factors and inferences uniquely within the province of a jury. The determination of whether an insurer acted in bad faith involves a review of the evolving body of information that is developed over the course of the management of the claim and the settlement posture of the parties as the litigation progresses.

Although the plaintiff's burden of proof in a bad faith action is correctly stated by the majority, in our view the majority fails to provide appropriate scrutiny to the legion of factors the Court of Appeals has identified as necessary in reaching the conclusion that there was no bad faith as a matter of law (see Pavia v

*State Farm Mut. Auto. Ins. Co.*, 82 NY2d 445, 454-455 [1993], *rearg denied* 83 NY2d 779 [1994]). Although not mentioned by the majority, we also note at the outset that the jury verdict against Thomas S. Fitzpatrick in the underlying personal injury action was $740,000 and defendant's highest settlement offer was $55,000. The limit of Fitzpatrick's insurance policy with defendant was $300,000, and the sum of $289,489 was available after payment of other claims.

One of the important factors to be considered in evaluating the merits of a bad faith claim is the likelihood that a verdict in favor of the injured claimant, in this case Jennifer M. Doherty (Doherty), would exceed the policy limit (*see* PJI 4:67). Here, the record establishes that, on May 9, 2003, defendant concluded, with respect to the issue of negligence, that it had "no legal defenses" and, on January 9, 2003, defendant determined that its proportionate share of fault for liability in this rear-end accident was "100%." On December 11, 2003, defendant's claim representative advised defendant's counsel that a motion for summary judgment on the serious injury threshold was not authorized because defendant's own "IME indicate[d] [Doherty] is disabled" and that such a motion would not be granted since defendant's "IME was completed on 11/4/03 (1 year and 2 mos after the [date of loss]) indicating [Doherty] is still disabled." Thus, defendant had already determined that its insured was 100% responsible for the accident and that Doherty was still disabled more than one year after the accident. All serious doubts about culpability for the accident were resolved in Doherty's favor very early on in the process. The only issues to be resolved were whether Doherty sustained a threshold serious injury and, if so, the damages to be awarded.

On August 13, 2004, notwithstanding defendant's prior determination that Doherty was still disabled more than a year after the accident, Supreme Court denied a motion for summary judgment by Fitzpatrick on the issue of the serious injury threshold. In making this determination, the court stated that Doherty and her husband presented "objective evidence" of a serious injury which was supported by the "qualitative assessment" of Doherty's orthopedic surgeon.

Doherty was 27 years old in December 2003 and had a life expectancy of 54.4 years (*see* 1B NY PJI3d, appendix A, at 1729 [2010]). Thus, defendant's potential exposure included 54.4 years of future pain and suffering and disability. The jury awarded $500,000 for future pain and suffering. There is no indication in defendant's file that it calculated Doherty's life expectancy at any time.

Necessarily inherent in an insurer's duty to its insured is a well-reasoned and thorough analysis leading to the establishment of a predicted jury verdict value in the event of a verdict in favor of the injured claimant (*see* PJI 4:67). The record is devoid of any assertion by defendant that it had evaluated and actually assigned a potential jury verdict value, as compared to a settlement value, to Doherty's personal injury claim. Indeed, defendant's claim representative admitted that she never assigned a value or even a value *range* to the claim and could not recall how she arrived at the $10,000 settlement offer that remained in place until the first day of trial, when it was increased to $25,000. The record does not contain evidence of any analysis by defendant of the potential for high-end jury verdicts in the trial venue or any examination of jury verdict reports in cases with similar injuries in similar venues. Thus, in our view, on this record, defendant utterly failed to satisfy one of the most fundamental factors essential to a finding of good faith.

Although the majority concludes that defendant "investigated the claim in the underlying action," we submit that the quality and thoroughness of that investigation should be the subject of careful review. It is for the jury to decide if "[a] reasonable investigation of the facts . . . would indicate that the chances of successfully defending the [underlying] action were very remote" (*State of New York v Merchants Ins. Co. of N.H.*, 109 AD2d 935, 936 [1985]). Here, it is undisputed that Doherty and her husband presented defendant with qualified and well-respected medical testimony and opinion that she had sustained a significant shoulder injury in addition to permanent injuries at multiple levels of her cervical spine and a disc injury in her lumbar spine at the L5-S1 level. Yet, the record is equally clear that defendant did not attempt to obtain an independent medical examination related to Doherty's shoulder and, in fact, relied upon the limited examination of a neurologist who admitted that she was not qualified to offer an opinion regarding Doherty's shoulder and that accident biomechanics was "a weak point in her expertise." Defendant's examining physician provided this videotaped testimony on August 31, 2004. The trial commenced on September 9, 2004. Thus, we conclude that, when the trial began, defendant knew that it had no competent evidence to rebut the evidence of Doherty and her husband with respect to Doherty's injured shoulder and the need for surgical repair.

While the majority notes that defendant had obtained videotape surveillance of Doherty—a stay-at-home mother of

two children ages five and seven—engaging in "activities without apparent difficulty," including carrying her children, the record establishes that, once the trial began, defendant made no evaluation of the jury composition, which included four women who might understand and sympathize with Doherty's lack of choice in engaging in those activities while Doherty's husband worked at two jobs. In our view, a defendant does not establish good faith by using tunnel vision to evaluate the claim and the evolving nature of the process.

The record also establishes that defendant was never prepared to offer the policy limits in that the claim manager's settlement authority was limited to $150,000, and the claim manager testified that he never spoke with his supervisor concerning authorization to offer a greater amount.

We disagree with the majority's conclusion that defendant's participation in settlement negotiations is indicative of its good faith. Even the ultimate tender of full policy limits on the eve of trial cannot insulate an insurer from liability for bad faith failure to settle within policy limits (*see Knobloch v Royal Globe Ins. Co.*, 38 NY2d 471, 478 [1976]). Here, on the first day of trial, defendant's counsel advised that he needed to revise his exposure opinion and that, if the jury believed that Doherty needed surgery, the potential exposure was above $250,000. Although defendant had no expert to rebut Doherty's need for shoulder surgery, its settlement offer remained at $25,000. Four days into trial, defendant's settlement offer was increased to $55,000. The settlement demand of Doherty and her husband was $240,000—well within the policy limits and below the potential exposure indicated by defendant's counsel. Their counsel thereafter declined to continue negotiations and an opportunity to settle within the policy limits had been lost. To the extent that defendant contends that Doherty and her husband cut off settlement discussion or denied defendant an opportunity to settle, the jury could reasonably conclude that their decision to do so "was the direct result of defendant's own conduct" because "[d]efendant never indicated that it would make a fair and reasonable offer and, by failing to do so, defendant suppressed negotiations" (*State of New York v Merchants Ins. Co. of N.H.*, 109 AD2d 935, 937 [1985]).

We also recognize that opportunities to settle the claim within the policy limits can be lost at various points in the evolving continuum of the litigation and claim management process. In our view, an opportunity to settle the claim may be lost early in the process and may not be recovered or the bad faith cured by subsequent conduct. In other words, we do not believe that an

insurer's bad faith is measured at the moment before the jury returns a verdict. Instead, conduct by the insurer weeks or months before the jury verdict may have entrenched the parties or foreclosed the opportunity for settlement long before a jury is empaneled. Thus, in our view, the fact that defendant made a "high-low" offer four days after the trial commenced is not dispositive. Even assuming, arguendo, that the "high-low" offer was meaningful, which, in our view, it was not, such "a belated tender [does not] operate without more to exonerate a carrier from a *pre-existing* liability for bad-faith failure to settle within policy limits" (*Knobloch*, 38 NY2d at 478 [emphasis added]). Our own precedent establishes that the delayed unconditional making of a settlement offer of the full policy limits does not automatically relieve the carrier of liability (*see Reifenstein v Allstate Ins. Co.*, 92 AD2d 715, 716 [1983]). It is not the mere fact that a "high-low" offer was made, but also the timing of that offer that must be evaluated in light of all the circumstances. Therefore, we cannot agree with the majority that defendant's "high-low" offer conclusively demonstrates that defendant met its good faith obligation. Instead, it is "but a factor for the jury to consider on the question of bad faith" (*id*. at 716).

Lastly, in our view, the contention of defendant that its reliance upon the trial court's discussions during settlement conferences provides some form of absolution from a bad faith claim is misplaced. We conclude that, had the trial court recommended a settlement figure more favorable to Doherty, such as $700,000, defendant would have summarily rejected the trial court's view. In any event, we are well aware that, during settlement conferences, a trial court is not provided full access to the files and investigative materials of the parties. In our view, defendant's good faith is measured by what it knew and had in its files—not by a trial court's view of the case based upon limited information provided during a settlement conference.

Therefore, we conclude that there are issues of fact whether defendant "engaged in a pattern of behavior evincing a conscious or knowing indifference to the probability that [its] insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted" (*Pavia*, 82 NY2d at 453-454; *see Kumar v American Tr. Ins. Co.*, 57 AD3d 1449 [2008]).

Thus, we would reverse the order, deny defendant's motion for summary judgment and reinstate the complaint. Present—Scudder, P.J., Smith, Centra, Carni and Pine, JJ.