**GENERAL STAR NATIONAL INSURANCE COMPANY,**
Appellant,

v.

**LIBERTY MUTUAL INSURANCE COMPANY.**

No. 91–1497.

United States Court of Appeals, Third Circuit.

Argued Jan. 27, 1992.

Decided April 3, 1992.

Rehearing and Rehearing En Banc Denied May 8, 1992.

Glenn C. Equi (argued), James M. Brogan, A. Christopher Young, Harvey, Pennington, Herting & Renneisen, Philadelphia, Pa., for appellant.

Gerard J. Jackson, Joseph V. Pinto (argued), White & Williams, Philadelphia, Pa., for appellee.

Before: MANSMANN, HUTCHINSON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

The dispute in this case concerns an insurance company's duty of good faith in conducting a defense and settlement negotiations on behalf of its insured. We conclude that New York law governed this dispute brought by a Connecticut excess insurer against a Massachusetts primary insurer, alleging a breach of the primary insurer's duty of good faith owed to its insured, a New York corporation. Although the district court incorrectly applied Pennsylvania law in deciding that the primary insurer did not breach its duty, we conclude that the application of New York law to the facts requires the same result. We will therefore affirm the judgment of the district court.

### I.

This litigation arises out of an underlying case in which Liberty Mutual, a Massachusetts insurer, undertook to defend Choice Courier, Inc., a New York corporation, in a diversity action brought in the United States District Court for the Eastern District of Pennsylvania by Richard D. Gormley. Florence Gormley, his wife, had died as a result of injuries sustained in a head-on collision with a van driven by an agent of Choice Courier. The agent had been driving the van with bald tires; he had also been driving many hours in excess of the regulatory limits. The jury returned a verdict in favor of the estate and in favor of Mr. Gormley in his own right in the amount of $1.8 million in compensatory damages and $3.9 million in punitive damages. In settlement, Mr. Gormley and the estate relinquished the $3.9 million in punitive damages in exchange for prompt payment of the full $1.8 million in compensatory damages. As Choice Courier's excess insurer, General Star contributed $765,000 to the settlement.

After the post verdict settlement of the *Gormley* case, General Star filed its complaint against Liberty Mutual in the United States District Court for the Eastern District of Pennsylvania. General Star, as Choice Courier's equitable subrogee,

sought to recover the $765,000 it paid in settlement on the theory that Liberty Mutual either breached its duty to settle in good faith, or recklessly disregarded the interests of its insured, Choice Courier.

On General Star's motion in limine, the district court decided that the dispute would be governed by Pennsylvania law, *General Star Nat'l Ins. Co. v. Liberty Mutual Ins. Co.*, No. 88–8786, 1990 WL 171525 (E.D.Pa. filed Nov. 1, 1990) (*General Star I*). Then, after a non-jury trial, the district court concluded that Liberty Mutual was not liable under Pennsylvania's bad faith standard, and entered judgment in Liberty Mutual's favor. *General Star Nat'l Ins. Co. v. Liberty Mutual Ins. Co. (General Star II)*, No. 88–8786, 1991 WL 83099 (E.D.Pa. filed May 15, 1991) (mem. op.) (citing *Cowden v. Aetna Casualty and Surety Company*, 389 Pa. 459, 134 A.2d 223 (1957)).

On appeal, General Star seeks application of New York law, challenges the district court's finding that an excess verdict was not reasonably foreseeable, and argues that Liberty Mutual's conduct was in bad faith under New York law.

We have jurisdiction over this appeal from a final order of the district court sitting in diversity. 28 U.S.C. §§ 1291, 1332. Our review of the district court's conclusions of law and application of law to the facts is plenary. *Mellon Bank v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir.1991). The "clearly erroneous" standard governs our review of findings of fact. *Leeper v. United States*, 756 F.2d 300, 308 (3d Cir.1985).

## II.

We first address the choice of law question. As this is a diversity case, we apply the forum state's choice of law rule. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pennsylvania's rule requires examination of the significant contacts as they relate to the states' public policies underlying the issue in question. *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 856 (1970); *see also Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1312–15 (3d Cir.1978) (predicting Pennsylvania would apply the combination of significant contacts and interest analysis to contract actions).

The district court concluded that the significant contacts were with Pennsylvania because the *Gormley* trial took place in Pennsylvania. The district court therefore held that Pennsylvania had a greater interest than did New York in having its law applied. *General Star I*, at 5.

For purposes of the choice of law decision, the district court characterized the legal issue as the reasonableness *vel non* of Liberty Mutual's conduct in litigating the case. While this issue of reasonableness is common to both Pennsylvania and New York law, the central issue for choice of law purposes was the *duty* owed by Liberty Mutual to Choice Courier and General Star. If New York law were to impose a higher duty, the reasonableness of Liberty Mutual's actions might be irrelevant.[1]

Although the underlying trial and settlement negotiations took place in Pennsylvania, all of the parties to this litigation reside elsewhere, and the contract of insurance was presumably delivered in New York. Because the protection of insured parties is the primary public policy behind laws governing duties owed by an insurer to an insured, Pennsylvania has little interest in furthering the primary public policy implicated here: protection of a New York insured and a Connecticut excess insurer by means of regulating the conduct of a Massachusetts primary insurer.[2] As be-

---

1. For example, if New York were to require acceptance of any settlement offer within policy limits, the rejection of an offer would be "reasonable" and still fall below the posited standard.

2. Any rule governing a duty to settle will have a secondary effect on litigation within the forum and the ability of a plaintiff to recover. For example, an absolute duty to accept any settlement offer within policy limits would likely increase the number of settlements at or near the policy limits. This effect is secondary be-

tween New York and Pennsylvania law, New York law should regulate the relations between these parties.[3]

■ This is not to say that Pennsylvania law and customs are irrelevant. For example, burdens of proof are determined by reference to Pennsylvania law. *See Foley v. Pittsburgh–Des Moines Co.*, 363 Pa. 1, 68 A.2d 517, 521 (1949) (law of the forum governs burdens of proof). Furthermore, the foreseeability of a Pennsylvania verdict is properly determined by reference to applicable Pennsylvania law and practice. Thus it was sound judgment for the district court to rely on opinions of Pennsylvania attorneys to resolve whether "the underlying case did not present a realistic, reasonably foreseeable threat to Liberty Mutual's primary coverage of $1 million." *General Star II*, ¶ 59 at 11–12.

### III.

■ We next examine New York's law to determine whether the district court's application of law to the facts may be upheld even if New York's standard is applied.

■ The law of New York imposes a duty of good faith upon an insurer in the litigation and settlement of claims against an insured. *Gordon v. Nationwide Mutual Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601, 608, 285 N.E.2d 849, 854 (1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973). This duty of good faith is consistent with New York's implied covenant of good faith and fair dealing in every contract. *See id.; see also St. Paul Fire & Marine Ins. Co. v. United States Fidelity & Guaranty Co.*, 43 N.Y.2d 977, 404 N.Y.S.2d 552, 553, 375 N.E.2d 733, 734 (1978) (insurer has "implied obligation to manage its insureds' defense in good faith").

■ Thus, a complaint alleging bad faith in settlement states a cognizable claim in New York. *See, e.g., State v. Merchants*

*Ins. Co. of New Hampshire*, 109 A.D.2d 935, 486 N.Y.S.2d 412 (1985) (allegation of bad faith and resulting damages sets forth prima facie case). An allegation of mere negligence, however, does not suffice to state a claim, unless the contract calls for the insurer to exercise due care. *See, e.g., Best Building Co. v. Employers' Liability Assur. Co.*, 247 N.Y. 451, 160 N.E. 911, 912 (1928) (the contract must measure the liability in the absence of fraud or bad faith).

■ According to New York law, a primary insurer's duty of good faith runs not only to its insured, but also to an excess insurer. *See St. Paul Fire & Marine Ins. Co.*, 404 N.Y.S.2d at 553, 375 N.E.2d at 734; *Hartford Accident & Indemnity Co. v. Michigan Mutual Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175 (1983), *aff'd*, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984).

In *Gordon*, New York's Court of Appeals set forth a standard of what constitutes bad faith in the defense and settlement of claims against insureds. "[B]ad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract." *Gordon*, 334 N.Y.S.2d at 608, 285 N.E.2d at 854; *see also Decker v. Amalgamated Mutual Casualty Ins. Co.*, 35 N.Y.2d 950, 365 N.Y.S.2d 172, 324 N.E.2d 552 (1974) (indicating that applicable standard is set out in *Gordon*). The Court of Appeals has not retreated from the *Gordon* standard, although the court has rarely elaborated upon it. *See Dano v. Royal Globe Ins. Co.*, 59 N.Y.2d 827, 464 N.Y.S.2d 741, 451 N.E.2d 488 (1983) (mem. op.) (citing *Gordon*); *Halpin v. Prudential Ins. Co.*, 48 N.Y.2d 906, 425 N.Y.S.2d 48, 401 N.E.2d 171 (1979) (citing *Gordon*); *United States Fidelity & Gty. Co. v. Copfer*, 48 N.Y.2d 871, 424 N.Y.S.2d 356, 400 N.E.2d 298 (1979) (citing *Gordon*); *St. Paul Fire & Marine Ins. Co. v. United States Fidelity & Gty. Co.*, 43 N.Y.2d 977, 404 N.Y.S.2d 552, 375 N.E.2d 733 (1978) (mem. op.) (citing *Gordon*); *Kulak v. Na-*

---

cause the duty imposed runs to an insured defendant, not to a plaintiff seeking settlement.

**3.** The parties do not argue that the law of any state other than New York or Pennsylvania should govern and so we confine ourselves to a choice between the two.

tionwide Mut. Ins. Co., 40 N.Y.2d 140, 386 N.Y.S.2d 87, 351 N.E.2d 735 (1976) (citing Gordon); Knobloch v. Royal Globe Ins. Co., 38 N.Y.2d 471, 381 N.Y.S.2d 433, 344 N.E.2d 364 (1976) (citing Gordon).[4]

Although New York's highest court has not comprehensively defined bad faith in insurance cases, the court has clearly adopted several principles which have importance here.

■ First, a finding of bad faith requires "evidentiary proof of the gross disregard of the insured's rights." Dano, 464 N.Y.S.2d at 742, 451 N.E.2d at 489; see also Gordon, 334 N.Y.S.2d at 608, 285 N.E.2d at 854 (requiring "extraordinary showing of disingenuous or dishonest" conduct).

■ Second, the trier of fact may infer bad faith from, among other things, the probability of an unfavorable verdict in an amount exceeding policy limits. See Kulak, 386 N.Y.S.2d at 92, 351 N.E.2d at 740 (conclusions as to likely verdict and amount were within consequence of jury, not expert); Knobloch, 381 N.Y.S.2d at 438, 344 N.E.2d at 369. Thus, if there is "no possibility of the insured being cast in damages which exceed policy limits by reason of the insurer's conduct," no recovery under Gordon may be obtained, Halpin, 425 N.Y.S.2d at 49, 401 N.E.2d at 172, and, conversely, once a jury has conclusively determined liability, an insurer's "intractable opposition to any settlement of the claim" may amount to a breach of its obligation to manage the insured's defense in good faith, St. Paul Fire, 404 N.Y.S.2d at 553, 375 N.E.2d at 734.

Third, in addition to the likely verdict and its amount, relevant evidence of bad faith includes the conduct of the insurer, such as (1) a refusal to respond to its insured's direct inquiry, see Feliberty v. Damon, 72 N.Y.2d 112, 531 N.Y.S.2d 778, 780, 527 N.E.2d 261, 263 & n. 2 (1988); Knobloch, 381 N.Y.S.2d at 438, 344 N.E.2d at 369; (2) any settlement offers and amounts actually tendered, see Knobloch, 381 N.Y.S.2d at 437, 344 N.E.2d at 368, and (3) steps taken in evaluating the case, Knobloch, 381 N.Y.S.2d at 438–39, 344 N.E.2d at 369–70.

■ Finally, causation is an element in a claim of bad faith. Thus if there is "no showing whatsoever that the insured lost an actual opportunity to settle ... within the coverage limits of his policy by reason of the insurer's purported 'bad faith,' " the claim must be rejected. United States Fidelity & Gty. Co., 424 N.Y.S.2d at 356, 400 N.E.2d at 298.

### IV.

We turn now specifically to the facts as found by the district court.

The Gormley complaint had sought both compensatory and punitive damages against Choice Courier. As Choice Courier's primary insurer, Liberty Mutual exer-

---

4. In Kulak and Knobloch the New York Court of Appeals did not address the definition of bad faith. Kulak concerned the admissibility of expert testimony on the issue of damages; the court merely opined that there was sufficient evidence in the record to find bad faith and remanded for a new trial without the offending testimony. Kulak, 386 N.Y.S.2d at 87, 351 N.E.2d at 735. In Knobloch, the court upheld a verdict of bad faith on a standard less demanding than Gordon, but the court explicitly stated that its decision was grounded on the law of the case, and, citing Gordon, the court expressly declined to redefine or rearticulate the bad faith standard. Knobloch, 381 N.Y.S.2d at 433, 344 N.E.2d at 364.

General Star has argued that New York requires "utmost good faith" in litigating an insured's defense. In support, General Star has cited a few intermediate and trial court opinions that appear to have abandoned the Gordon standard by failing to acknowledge it. Gordon, however, remains valid and binding authority in all four of New York's judicial departments, and has been acknowledged as such in each. See, e.g., Dawn Frosted Meats, Inc. v. Insurance Co. of N. America, 99 A.D.2d 448, 470 N.Y.S.2d 624, 625 (1st Dep't), aff'd, 62 N.Y.2d 895, 478 N.Y.S.2d 867, 467 N.E.2d 531 (1984); Roldan v. Allstate Ins. Co., 149 A.D.2d 20, 544 N.Y.S.2d 359, 369 (1989) (2d Dep't); Salka v. Lumbermens Mut. Cas. Co., 127 A.D.2d 333, 515 N.Y.S.2d 344 (1987) (3d Dep't) (citing Gordon in the context of punitive damages); Reifenstein v. Allstate Ins. Co., 92 A.D.2d 715, 461 N.Y.S.2d 104 (1983) (4th Dep't).

cised its right to defend and settle all claims arising out of the accident. With respect to compensatory damages, Liberty Mutual understood this case to be one of clear liability for Choice Courier. Liberty Mutual knew that the van driver had been working 14 hours, that he had crossed the median, and that the van's tires were bald, potentially evidencing the absence of an inspection procedure. Liberty Mutual did not retain an accident reconstructionist.

With respect to punitive damages, the district court implicitly found that Liberty Mutual reasonably believed that the plaintiffs' theory of recovery was not viable. Among other things, this belief was based on attorney Perry S. Bechtle's opinion that the claim for punitive damages was not viable under Pennsylvania law. Bechtle, a senior partner with Liberty Mutual's outside counsel, had 35 years experience as a trial lawyer with a specialty in the personal injury field. His colleagues, Leslie Martinelli Cyr and James Wilder, shared his opinion of the case. Wilder—also a senior partner—tried the case, made timely objections to the punitive damages charge, and filed post trial motions to set aside or reduce the verdict.

Although Choice Courier's liability was fairly clear, the district court found that the *Gormley* case did not present a realistic, reasonable threat to Liberty Mutual's primary coverage of $1 million. In part, Liberty Mutual relied again on the assessment of Bechtle, who, coincidentally, had known of Mrs. Gormley's reputation as a fine person in the community.[5] Bechtle advised Liberty Mutual of a settlement val-

ue in an amount of between $350,000 and $500,000.

Also, the Gormleys' own economist estimated a loss of household services of between $252,720 and $303,264. He estimated loss of potential earnings minus personal maintenance of between $95,631 and $191,408.[6] The highest sum of these estimates totaled $494,627—less than one half of Choice Courier's policy limit.

Furthermore, at the pretrial settlement conference, the judge overseeing the *Gormley* case expressed the opinion that the plaintiffs' settlement offer of $900,000 was unreasonably high, and he informed counsel that he would not attempt to mediate a settlement.

General Star did not actively participate in the *Gormley* litigation. It knew of the facts as early as March 24, 1987, three months before trial. It did not ask to review Liberty Mutual's case file, a customary privilege in the insurance industry. Thinking that Choice Courier would not be exposed to liability requiring payment under the excess policy, General Star retired its own file in early May. General Star did not monitor the late June trial, although it had opportunity to do so.[7]

General Star's active participation in the *Gormley* case began after the jury received a punitive damages charge. Liberty Mutual informed Choice Courier of the charge and of Choice Courier's potential liability. Choice Courier in turn contacted General Star, who entered an appearance the next day—the day the jury awarded damages. General Star did participate in the post verdict settlement agreement, in which the Gormleys relinquished their puni-

---

5. We presume that the district court thought that this fact was relevant in assessing the basis of Bechtle's estimate and that the fact was probative of whether or not Bechtle adequately considered jury sympathy in his prediction of a probable verdict amount.

6. The economist presumably based his estimate on the facts that Mrs. Gormley was 50 years old and her youngest child was 18; she had attended one year of college; she had not earned a regular income since prior to her marriage; she

was not gainfully employed at the time of the accident, but was considering returning to the work force.

7. This finding of the district court, *General Star II,* at ¶ 55, is somewhat in tension with a separate finding that, Liberty Mutual never advised General Star of a trial date, contrary to an indication that it would. Even if Liberty Mutual failed to advise General Star of the date, however, General Star would still have had the opportunity to monitor the trial.

tive damages claim for prompt payment of $1.8 million in compensatory damages. General Star's liability on this payment was $765,000.

Liberty Mutual's conduct in settling the case had some irregularities. As early as May 10, 1987, the branch office handling the case had requested authorization to settle for $300,000.[8] The home office did not grant the authorization, but did increase its reserves from $150,000 to $400,000 on or about May 29th.

On June 8, 1987, Liberty Mutual informed General Star that a settlement offer of $200,000 had been made. From the district court's opinion, this information was incorrect; the $200,000 offer was made on June 29th. On June 16, 1987, Liberty Mutual advised General Star that the case would probably settle for an amount between $350,000 and $500,000.

The district court's findings are silent as to the amount and timing of Liberty Mutual's initial settlement offer. The record reflects that Liberty Mutual had initially offered $100,000. This offer appears to have been the only one made before trial.

On June 29, 1987, the first day of trial, Liberty Mutual increased its offer to $200,000.[9] Before the jury returned its verdict, Liberty Mutual had further increased its offer to a total of $335,000 in response to the plaintiffs' demand of $600,000. Liberty Mutual was also offering a "high/low" that would cap recovery at $600,000 while guaranteeing recovery of $200,000 in the event of a verdict of no liability. Liberty Mutual did not respond to the plaintiffs' inquiry regarding a cap of $800,000. Soon after, the jury returned a verdict far in excess of the expectations of all of the parties.[10]

Like its conduct in settlement negotiations, Liberty Mutual's interaction with Choice Courier also had some irregularities. First, even though Liberty Mutual usually informs an insured of a punitive damages claim in writing, Liberty Mutual did not do so here. Choice Courier was informed orally of the punitive damages claim by Mr. Bechtle at the deposition of Arthur Roth, president of Choice Courier; Choice Courier also had a copy of the complaint, which contained notice of the punitive damages claim. Second, Liberty Mutual did not immediately inform Choice Courier that Pennsylvania law prohibits payment by an insurer of punitive damages. After the jury had been given a punitive damages charge, Liberty Mutual informed Choice Courier of the Pennsylvania law and of Choice Courier's potential liability.

Although the district court concluded that there was no evidence that Liberty Mutual engaged in dishonest or fraudulent activity, the district court also concluded that Liberty Mutual's inability to respond more expeditiously to settlement offers constituted a bad claims practice.

## V.

With the law of New York in mind, we have reviewed the district court's findings of fact and applications of law to the facts under the appropriate standards. We have determined that the district court's crucial finding—that there was no evidence of dishonesty or bad faith—precludes General Star's recovery in the context of New York's bad faith standard of dishonesty, disingenuousness, *see Gordon,* 334 N.Y.S.2d at 608, 285 N.E.2d at 854, or reckless disregard of the insured's rights. *See Dano,* 464 N.Y.S.2d at 741, 451 N.E.2d at 488.

The district court concluded:

---

**8.** Although the district court's findings are not crystal clear, it appears that this request was made before Mr. Bechtle estimated the settlement value at $350,000 to $500,000.

**9.** The breakdown of the offer was $165,000 from Choice Courier, plus $35,000 from the driver of the van.

**10.** As noted *supra,* the verdict was for $1.8 million in compensatory damages and $3.9 million in punitive damages. Settlement was for $1.8 million, of which General Star paid $765,000.

The simple fact is that some of the very best minds in this district viewed the underlying case as one which simply did not have a potential verdict in excess of the policy limits. I fail to see how relying on that type of expertise can be grounds for a subsequent bad faith claim.

*General Star II*, at 14.

The district court reached its conclusion of absence of bad faith by initially concluding that a verdict over the policy limit was not reasonably foreseeable. In reaching the foreseeability determination, the district court primarily relied on the expert testimony of Albert Bricklin. On the basis of the report of the Gormleys' own economist, and the lack of viable claims for pain and suffering and for punitive damages, Bricklin placed a reasonable value on the *Gormley* case of between $365,000 and $510,000. *See General Star II*, ¶ 59 at 11; app. at 1024–42 (Bricklin testimony). The district court also relied on the following facts: (1) Liberty Mutual's attorneys did not believe the verdict would exceed the policy limit; (2) the trial judge overseeing the *Gormley* litigation thought that the plaintiff's settlement demand of $900,000 was unreasonably high;[11] and (3) the conduct of Gormleys' attorney indicated that he did not value his client's case at above the policy limit. *See General Star II*, ¶ 59 at 12.

### A.

General Star has attempted to upset the district court's factual determinations by arguing that punitive damages were in fact legally viable; that the conduct of the Gormleys' attorney did not indicate he valued the case below the policy limit; and that the assessment of the judge overseeing *Gormley* was of settlement value and not of verdict potential. There was, however, ample evidence to support the district court's findings, which may only be set

aside on appeal if they were clearly erroneous. *Leeper*, 756 F.2d at 308.

First, although there is often a disparity between verdict potential and settlement value, that differential decreases when the issue of liability is fairly clear, as General Star admits it was here. General Star does not dispute that the Gormleys' own economist estimated loss at well below the policy limit.

Second, there was sufficient evidence for the district court to find that the Gormleys' attorney had thought that the case was not worth more than the policy limit. In his deposition, the attorney recalled estimates of the value of the case ranging from $200,000 to $1,000,000. App. at 180 (Dep. of Roy DeCaro).

Finally, the evidence supports the district court's determination that Liberty Mutual reasonably believed that punitive damages were not viable. The Gormleys' attorney relinquished the punitive damages in part because he thought they might not stand on appeal. Liberty Mutual's experienced attorneys testified that they had not thought that the punitive damages claim was viable, and that they litigated the case accordingly. The district court did not make any findings regarding the actual viability of the punitive damages claim, but it was correct to focus on Liberty Mutual's reasonable belief. The claim's actual viability is irrelevant to the question of Liberty Mutual's bad faith, unless the claim's validity was so obvious that Liberty Mutual's conduct was in gross disregard of Choice Courier's rights. General Star has not made such an allegation.

We also note that, under Pennsylvania law, General Star cannot cover Choice Courier's liability for punitive damages. Moreover, the Gormleys' claim for punitive damages was dropped in settlement. Therefore, General Star cannot be equita-

---

11. In a deposition taken in contemplation of this litigation, Gormley's attorney put it more strongly: "We had a couple of meetings with [the trial judge]. He was beating up on me." App. at 182 (Dep. of Roy DeCaro).

bly subrogated for those damages. With respect to General Star's claim based on Choice Courier's liability for compensatory damages, Liberty Mutual's conduct regarding punitive damages cannot be said to have caused the extraordinary verdict of compensatory damages.

### B.

With respect to General Star's remaining challenges, General Star argues that Liberty Mutual's "bad claims practice" constituted a breach of its duty to settle in good faith; and that Liberty Mutual's delay in informing Choice Courier of its possible liability for punitive damages constituted bad faith *per se*.[12] Because these challenges require application of law to the facts, we exercise de novo review. *Mellon Bank v. Metro Communications, Inc.*, 945 F.2d at 642.

■ We cannot accept General Star's theory that a "bad claims practice" is *per se* a breach of the insurer's duty of good faith. The theory stems from what amounts to an unsupported argument that New York Insurance Law § 2601(a)(4) (McKinney 1985) (defining failure to attempt prompt settlement of valid claims as an unfair practice) somehow abrogated caselaw. It is far from clear, however, that section 2601(a)(4) was enacted to change New York's common law standard of bad faith or to provide a private cause of action. *State v. Merchants Ins. Co.*, 486 N.Y.S.2d at 413–14, upon which General Star relies, is not to the contrary. Although the opinion refers to the Insurance Law, the court in the *Merchants Ins. Co.* case determined that "[i]t was readily foreseeable that a verdict would reach or exceed the policy limits." *Id.* Such was not the case here.

Liberty Mutual's bad claims practice must therefore be measured against the standard articulated in *Gordon* and other New York cases. The facts indicate that there was little probability of a verdict in excess of the policy limits. *See Kulak*, 386 N.Y.S.2d at 92, 351 N.E.2d at 740. The facts do not show that there was an intractable opposition on the part of Liberty Mutual to any settlement of the claim, *see St. Paul Fire*, 404 N.Y.S.2d at 553, 375 N.E.2d at 734, and they do not show any refusal to respond to the direct inquiry of either General Star or Choice Courier, *see Feliberty v. Damon*, 531 N.Y.S.2d at 778, 527 N.E.2d at 263 & n. 2.

Although Liberty Mutual's conduct might be variously characterized as negligent, incompetent, or excessively bureaucratic, General Star has not made an "extraordinary showing" of dishonesty or disingenuousness, as required under *Gordon*, 334 N.Y.S.2d at 608, 285 N.E.2d at 854. Nor has General Star shown bad faith by clear and convincing evidence, as required under Pennsylvania law, *see United States Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir.1985).

Moreover, General Star has not raised the issue in this court that exclusive of any principle of equitable subrogation, Liberty Mutual, as the primary insurer, owed an independent and direct duty to the excess carrier of an exacting standard of utmost good faith. *See Hartford Accident and Indem. Co.*, 475 N.Y.S.2d at 271, 463 N.E.2d at 610.

■ With respect to the failure to inform Choice Courier in writing of the punitive damages claim, and the delay in informing Choice Courier that Pennsylvania prohibits an insurer from paying punitive damages, we find these omissions most disturbing. They left the insured, on the eve of jury deliberations, with little opportunity to consult with private counsel and evaluate the case for settlement purposes, in-

---

**12.** General Star's other assertion, that a plaintiff's burden is to offer proof of a "failure to exercise good faith" as opposed to proof of bad faith, is without merit.

Also without merit is General Star's challenge to the district court's decision regarding the exclusion of certain testimony.

cluding whether to risk trial in light of the potential personal liability. However, because we agree with the district court's conclusion that Liberty Mutual reasonably believed that punitive damages were not viable, and because Choice Courier was aware from the onset of the litigation that the punitive damages claim existed, we believe that these omissions alone are insufficient to constitute the dishonesty or disingenuousness required by New York law. On appeal, General Star has not seriously challenged the district court's factual finding that Liberty Mutual's attorneys thought the punitive damages claim was not viable, or that Liberty Mutual reasonably relied on their opinion.[13]

In summary, General Star has neither made an extraordinary showing nor shown by clear and convincing evidence that Liberty Mutual's conduct constituted bad faith under the law of New York. The district court found as matter of fact that there was no dishonesty or fraud, and that finding has gone unchallenged here. We conclude that Liberty Mutual's conduct, although leaving much to be desired in its conduct toward the insured and the excess carrier, did not constitute bad faith under New York law.

## VI.

For the foregoing reasons we will affirm the judgment of the district court entered in favor of the defendant Liberty Mutual.

---

**13.** Instead, they argue that punitive damages were in fact viable. As we have discussed *infra*  Part V A, that argument is irrelevant.