Herbert **KILMER** and Elsie Kilmer,: his wife, Plaintiffs,

v.

The **CONNECTICUT INDEMNITY COMPANY, Defendant.**

·**No. 3:CV–99–0275.**

United States District Court, M.D. Pennsylvania.

Feb. 28, 2002.

---

Laurence M. Kelly, Kelly and Kelly, Montrose, PA, for plaintiffs.

Richard F. Andracki, Pittsburgh, PA, for defendant.

### *MEMORANDUM*

VANASKIE, Chief Judge.

Plaintiffs Herbert and Elsie Kilmer have filed this diversity action alleging bad faith liability under 42 Pa. Cons.Stat. Ann. § 8371 on the part of defendant Connecticut Indemnity Company.[1] The Kilmers' action is predicated on Connecticut Indemnity's alleged unreasonable delay in investigating the cause of the fire which destroyed their property in Solon, New York, as well as its alleged failure to pay and/or refusal to negotiate the amount of benefits payable under its insurance policy. Con-

necticut Indemnity disputes Kilmers' allegations and argues that its actions in handling plaintiffs' claim were both reasonable and in good faith and not in violation of the applicable law. Currently pending is Connecticut Indemnity's motion for summary judgment. Because genuine issues of material fact exist as to whether Connecticut Indemnity's alleged actions and omissions were both unreasonable and in bad faith, defendant's motion for summary judgment will be denied.

### *I. BACKGROUND*

On May 17, 1991, the Kilmers purchased 1,220 acres of land in Solon, Courtland County, New York for $700,000. In 1994, the Kilmers sold approximately 1,000 acres of that land to the Gutchess Lumber Company for $600,000, leaving approximately 228 acres, on which was situated the Four Seasons Ski Lodge. The property had not been operating as a ski resort when the Kilmers purchased the land, and it never became operational subsequent to their purchase. In May of 1994, the Kilmers listed the remaining 228 acres of land for sale. The two real estate agents contracted by the Kilmers to sell the property, Larry Birchard and Maureen Adams, who were working out of Binghamton, New York, were unsuccessful in marketing the parcel of land for sale at the suggested asking price.[2]

On March 10, 1998, the Kilmers entered into an insurance contract with Connecticut Indemnity for coverage of the ski

---

1. Originally, Kilmers' complaint contained two (2) counts. Count I was a claim under the policy seeking the payment of the damages sustained as a result of a fire to property owned by plaintiffs. This claim has been resolved under the terms of the policy and is not presently part of this action, except for the payment of interest on the amount ultimately paid. Count II seeks "bad faith" damages under the provisions of 42 Pa. Cons.Stat. Ann. § 8371.

2. There is a dispute regarding the asking price. Connecticut Indemnity asserts that the asking price was $275,000. (Def.'s Mot. for Summ. J. at ¶ 3.) The Kilmers, however, contend that "in Mr. Kilmer's mind, [he] had it listed for $500,000." (Pls.' Answer to Def.'s Mot. for Summ. J. at ¶ 2.)

lodge. The policy was purchased through the Kerwick Insurance Agency. According to defendant, Mr. Kilmer's insurance broker, Joe Kerwick, was told by Ed Cox, Mr. Kilmer's business employee, to have the building insured for $400,000. Prior to March 10, 1998, the Kilmer property in Solon, New York, was uninsured.

On July 28, 1998, the insured ski lodge was totally destroyed by a fire. Subsequent to the fire, on July 29, 1998, Don Roberts, a claims examiner for Connecticut Indemnity, received a telefax communication reporting that there was a total loss of the property in question. On July 30, 1998, Roberts traveled to the scene of the fire in Solon, New York. According to defendant, Roberts inspected and photographed the site and then completed a report detailing his examination of the fire scene. During his visit to the fire scene, Roberts was informed by Mr. Kilmer that the property had not generated any income in the seven years that the Kilmers had owned it. Present at the scene with Roberts and Kilmer were representatives of the Courtland County Sheriff's Department and the McGraw Fire Department (the first to respond to the scene), as well as Gary Kubber, the adjuster to whom Roberts assigned the claim.

On August 4, 1998, Mr. Kilmer prepared and signed the General Adjustment Bureau's Standard Fire Claim Form. On August 7, 1998, Roberts sent a letter to the Kilmers acknowledging receipt of their claim, and stating that Connecticut Indemnity was going to continue to investigate the fire due to possible misrepresentations in the application for insurance, such as the description of the building and the classification of protection assigned to the building. According to defendant, in completing the Kilmers' application for insurance, Kerwick admitted that he had made a few mistakes on the application. In investigating the possibility of misstatements on the application of insurance, Roberts took a statement from Kerwick to determine how the application was completed. In his statement, Kerwick said:

> I had no idea what protection class 6 was, and I really took a guess. I also put down that it was a masonry building. I don't know why—Ed Cox did not tell me it was 100% frame, nor did he tell me anything about any protection classes.

(Def.'s Affs. & Exs. in Sup. of Mot. for Summ. J., Ex. D.)

After visiting the fire scene, Roberts had hired a private cause and origin investigator, Dennis Ware, who was allegedly well-known to the Sheriff's Department for his competence in fire investigation. On August 31, 1998, Roberts notified his adjuster, Kubber, that he wanted a status report on Connecticut Indemnity's cause and origin investigation. On September 1, 1998, Roberts received the report from Ware.[3] Attached to the report was a copy of Ware's laboratory findings and a statement to Roberts that he was currently in the process of preparing a written report with regard to the destroyed skilodge.

On September 30, 1998, Roberts contacted his coverage counsel, Steven Helmer, Esquire, and informed him that the cause of the fire was determined to be arson, and that the building was considerably overinsured. At that point, Kubber arranged for a background check on Mr. Kilmer.

After reviewing the investigative reports, Roberts requested that Kilmer file a proof of loss. In his deposition, Roberts testified:

> We wanted Mr. Kilmer, based upon the information that we now had—we want-

---

**3.** Ware was employed with the Stauffer Investigative Services.

ed to know Mr. Kilmer's opinion or statement under oath as to how the fire started, how he determined, or determined what he considered to be the actual cash value of this structure, what the encumbrances might be on the property, any body who might have an interest in it besides himself. We wanted to know all of that information.

(Def.'s Br in Supp. of Mot. for Summ. J. at 7.)

As of September 1, 1998, Roberts had allegedly asked Kubber to prepare an "actual cash value" (ACV) estimate of the property. On October 10, 1998, Kubber was directed by Roberts to work up a statement of loss with regards to a possible offer to submit to the Kilmers in the event that Connecticut Indemnity's investigation determined that there was coverage for the loss. At that time, the figures were to be kept in the files of both Connecticut Indemnity and GAB Robbins.[4] In his deposition, Roberts testified that, as of October 10–11, 1998, Connecticut Indemnity could not offer the Kilmers a settlement because they needed to gather information necessary for a determination of responsibility for the loss. Roberts testified:

We were still gathering information. And based upon the information that we had both in the fire marshal's report and in the investigations conducted up to that point, it certainly did not appear that we were going to be making him an offer of settlement on October 10th or October 11th of 1998.

(Def.'s Br in Supp. of Mot. for Summ. J. at 7.)

On October 23, 1998, Kubber sent the Kilmers a Proof of Loss form to be returned within 60 days. On November 10, 1998, Roberts received the Kilmers' executed Proof of Loss. On November 19, 1998, Roberts contacted Kubber in an effort to confirm in writing how he was going to proceed regarding the proof of loss. On December 8, 1998, Connecticut Indemnity rejected the Kilmers' Proof of Loss. In a letter to the Kilmers, Roberts provided the following reasons for rejection of the Proof of Loss:

— A dispute concerning the amount cited in the Proof of Loss;

— Questions concerning the cause and origin of the fire;

— Incorrect claim for amount of debris removal;

— The occupancy of the building was incorrect;

— The Actual Cash Value of the property was not stated;

— The whole Loss and Damage was not stated.

(Def.'s Mot. for Summ. J. at 3.)

In addition to rejecting the Kilmers' Proof of Loss, Roberts also requested that the Kilmers appear for an Examination Under Oath regarding the claim. On January 13, 1999, Connecticut Indemnity's coverage counsel—Attorney Helmer—conducted the Kilmers' Examination Under Oath. According to the defendant, Roberts did not receive the transcript of the Examination Under Oath until February 10, 1999. On February 12, 1999, Roberts informed Attorney Helmer that Connecticut Indemnity had decided to honor the claim and offer a settlement. On February 19, 1994, before the offer was conveyed, the Kilmers filed this suit.

On March 2, 1999, Attorney Helmer informed the Kilmers' counsel that the carri-

---

**4.** Gary Kubber, the independent adjustor retained by Roberts, is employed with GAB Robbins, Syracuse, New York.

er was making payment in the amount of $162,364—Connecticut Indemnity's estimate of the actual cash value of the property.[5] The offer was subsequently rejected by the Kilmers.[6]

According to plaintiffs, following the Kilmers' rejection of the settlement offer, on April 5, 1999, nearly two months after the above-captioned suit was filed, current counsel for defendant made the first mention of the appraisal process referenced in the insurance policy. The Kilmers maintain that they promptly agreed to submit the dispute to an appraiser.[7] On May 20, 1999, litigation of this matter was stayed pending the outcome of a contractual appraisal procedure. The appraiser, John F. Havermeyer, III, determined that the total ACV for the property at the time of the fire was $223,800.[8] On December 16, 1999, Connecticut Indemnity tendered a check in the amount of $61,436 to the Kilmers' counsel in payment of the difference between what the appraiser determined was the ACV of the property on the date of the fire, and the amount previously paid without prejudice by Connecticut Indemnity to the Kilmers.

Following the Kilmers' acceptance of the independent appraiser's determination, plaintiffs resumed the litigation of this matter by asserting, *inter alia*, that Connecticut Indemnity's delay in the investigation into the cause and origin of the fire, as well as its failure to pay the claim and/or negotiate the amount to be paid, entitles

them to an award of damages under Pennsylvania's bad faith statute. On November 29, 2000, Connecticut Indemnity filed a motion for summary judgment and supporting brief on plaintiff's remaining bad faith and punitive damages claims. On December 14, 2000, the Kilmers filed their answer and opposing brief to Connecticut Indemnity's motion for summary judgment. The motion is ripe for disposition.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Young v. Quinlan*, 960 F.2d 351, 357 (3d Cir.1992). After such a showing has been made, the nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact. Rather, the nonmoving party must go beyond the pleadings and offer specific evidence contradicting the facts averred by the movant. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888,

---

5. Defendant's payment of $162,364 was made without prejudice to the Kilmers' right to claim recovery under the policy.

6. The Kilmers demanded payment of $410,000.

7. Connecticut Indemnity contends that the Kilmers rejected its demand for appraisal, while the Kilmers assert that, at no time, did they reject defendant's demand for appraisal, and that at the time of the filing of the complaint, "NEITHER PARTY had requested the implementation of the appraisal process that was part of the policy." (Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J. at 6; emphasis in original.)

8. The Kilmer's appraiser determined the ACV to be approximately $550,000. Connecticut Indemnity's appraiser valued the property at the time of the fire to be approximately $175,000.

110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); Fed.R.Civ.P. 56(e). "Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, [citation omitted] the nonmoving party ... 'must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on file'." *Pastore v. Bell Tel. Co. of Pennsylvania,* 24 F.3d 508, 511 (3d Cir. 1994) (quoting *Harter v. GAF Corp.,* 967 F.2d 846, 852 (3d Cir.1992)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). A disputed fact is material when it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 250, 106 S.Ct. 2505. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). All inferences, however, " 'should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.' " *Pastore,* 24 F.3d at 512 (quoting *Big Apple BMW, Inc. v. BMW of N. America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993)). "Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent." *Kostar v. Pepsi–Cola Metro. Bottling Co., Inc.,* No. Civ. A. 96–7130, 1998 WL 748306, *2 (E.D.Pa. October 23, 1998) (citing *Big Apple BMW,* 974 F.2d at 1363).

## B. Choice of Law

 A federal court sitting in diversity must apply the choice of law rules of the forum state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *St. Paul Fire & Marine Ins. Co. v. Lewis,* 935 F.2d 1428, 1431 n. 3 (3d Cir.1991). For both contract and tort actions, the Pennsylvania Supreme Court has adopted a flexible approach which combines a "significant relationship" test with a "governmental interest" analysis. *See Carrick v. Zurich–American Ins. Group,* 14 F.3d 907, 909 (3d Cir.1994); *Melville v. American Home Assurance,* 584 F.2d 1306 (3d Cir. 1978); *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). Stated another way, the Pennsylvania choice of law rule requires an examination of the significant contacts as they relate to the public policies underlying the issues presented in the litigation. *See KNK Medical–Dental Specialities, Ltd. v. Tamex Corp.,* No. Civ. A. 99–3409, 2000 WL 1470665, *2 (E.D.Pa. Sept.28, 2000) (citing *General Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.,* 960 F.2d 377 (3d Cir.1992)). The weight of the relevant state's contacts must be measured on a qualitative rather quantitative scale. *See Hartford Fire Ins. Co. v. WSR Corp.,* No. Civ. A. 99–6120, 2000 WL 974328, *3 (E.D.Pa. July 14, 2000). Under Pennsylvania choice-of-law precepts, the place having the most inter-

est in the controversy and which has the most intimate connection with the outcome is the forum whose law is applied.[9] *See Compl. of Bankers Trust Co.*, 752 F.2d 874, 882 (3d Cir.1984) (citing *Griffith*, 416 Pa. at 22, 203 A.2d at 805–806).

■■■ A threshold question in choice of law analysis is whether a false conflict exists. *See Le Jeune v. Bliss–Salem Inc.*, 85 F.3d 1069, 1071 (3d Cir.1996). As explained in *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997), "where the laws of the two jurisdictions would produce the same result on the particular issues presented, there is a 'false conflict' and the court should avoid the choice of law question." If there is no false conflict, the court must ascertain which state has the greater interest in the application of its law. *See Benevento v. Life USA Holding, Inc.*, 61 F.Supp.2d 407, 414 (E.D.Pa.1999).

■■■According to New York law, "bad faith requires an extraordinary showing of a disingenuous or dishonest failure to carry out a contract." *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601, 608, 285 N.E.2d 849 (1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973). It exists "where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted from indulging in similar conduct in the future." *Cohen v. New York Prop. Ins. Underwriting Ass'n*, 65 A.D.2d 71, 410 N.Y.S.2d 597, 601 (1978) (quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 404, 223 N.Y.S.2d 488, 490, 179 N.E.2d 497 (1961)).

■ Pennsylvania law, however, requires a plaintiff to make out a lower showing to satisfy its claim for bad faith. Under Pennsylvania law, in order to recover on a claim of bad faith, the insured must show, by clear and convincing evidence, that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. *See The Rector, Wardens and Vestryman of St. Peter's Church v. Am. Nat'l Fire Ins. Co.*, No. Civ. A. 00–2806, 2002 WL 59333, *10 (E.D.Pa. Jan.14, 2002).

The distinction between New York's and Pennsylvania's bad faith standards was recognized by the Third Circuit in *General Star*. In *General Star*, the court was called upon to resolve a conflict of law question between New York and Pennsylvania law on bad faith in settling liability claims. Implicit in the court's resolution of this question was its understanding that the choice potentially affected the outcome. 960 F.2d at 385. The same conclusion is compelled here. Because New York and Pennsylvania have different standards for evaluating claims of an insurer's bad faith, it is clear that no false conflict exists. Accordingly, a choice of law must be made.

■ Section 193 of the Restatement (Second) of Conflict of Laws provides guidance on the issue presented here. It states:

> The validity of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was

---

9. In contract disputes, Pennsylvania considers the factors promulgated in § 188 of the Restatement (Second) Conflict of Laws. *See KNK*, 2000 WL 1470665 at *3. The factors include: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) Conflict of Laws § 188 (1969).

to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties, in which event the local law of the other state will be applied.

In this case, the location of the insured risk—Solon, New York—is undisputed. This factor is entitled to "greater weight than any other single contact in determining the state of the applicable law . . . ." *Id.* at § 193, comment b.

Section 193 expressly contemplates, however, that the location of the insured risk is not controlling in all circumstances. Specifically, the law of the state where the insured risk is found is *not* to be applied where "some other state has a more significant relationship . . . . to the transaction and the parties, in which event the local law of the other state will be applied." *Id.* at § 193.

Plaintiffs assert that Pennsylvania has a "more significant relationship" in that: (1) the Kilmers are both domiciled and reside in Pennsylvania; (2) the insurance policy in question was negotiated in Pennsylvania; (3) the agent through whom the policy was issued is located in Pennsylvania; (4) the premium was paid in Pennsylvania; (5) the insurance company who issued the policy is licensed in Pennsylvania; (6) the insurance company who issued the policy is competing with other insurance companies domiciled and doing business in Pennsylvania; and (7) the Kilmers naturally expected the laws of Pennsylvania to protect them. Connecticut Indemnity counters the Kilmers' expectation argument by pointing to the insurance policy. In two provisions—one dealing with the prohibition of fraudulent conduct in completing the insurance application and the other concerning the appraisal process—it is explicitly stated that New York law would apply. Accordingly, Connecticut Indemnity argues that the Kilmers knew that the property covered under the insurance policy was subject to New York's property insurance laws.

In *General Star,* a Connecticut excess insurer brought an action in Pennsylvania against a Massachusetts primary insurer alleging the breach of the primary insurer's duty of good faith to a New York insured in connection with the handling of a liability claim in Pennsylvania. 960 F.2d at 378–79. In determining that New York had a greater interest in the application of its law than did Pennsylvania, and therefore, should govern the relations between the relevant parties, the Third Circuit stated:

> Because the *protection of insured parties* is the primary public policy behind laws governing duties owed by an insurer to an insured, Pennsylvania has little interest in furthering the primary public policy implicated here: protection of a New York insured and a Connecticut excess insurer by means of regulating the conduct of a Massachusetts primary insurer.

*Id.* at 379 (emphasis added).

This rationale supports application of Pennsylvania law in this case. In *General Star,* a New York insured's interests were at stake in litigation in Pennsylvania. In this case, Pennsylvania insureds are the aggrieved parties. New York would have little interest in offering protection to the Kilmers; Pennsylvania would have a compelling interest to do so. Connecticut Indemnity conducts business in Pennsylvania. It would not be unfair to require Connecticut Indemnity to abide by Pennsylvania requirements when administering insurance policies to Pennsylvania residents,. regardless of where the property is located, just as it was not unfair to apply New York law in *General Star* when deal-

ing with New York insurers who were responsible for handling the defense of a case filed in Pennsylvania.

Consistent with the Third Circuit's analysis in *General Star* is *Thiele v. Northern Mut. Ins. Co.*, 36 F.Supp.2d 852 (E.D.Wis. 1999). In *Thiele*, two insureds residing in Wisconsin filed an action against a Michigan property insurer for punitive damages, alleging that the insurer acted in bad faith in denying their claim for fire damage to a barn located in Michigan. *Id.* at 853. After employing the choice-of-law principles similar to those used by Pennsylvania courts, the district concluded that Wisconsin's choice-of-law principles required that Wisconsin law apply to the plaintiffs' bad faith claims. In reaching this conclusion, the court stated:

> [A]n insurance company that conducts business with residents of various states should expect to be subject to the tort laws of that state if the insurer engages in bad faith with respect to the insurance policy. Of course, if a company's operation is national in scope, it may be subject to the tort laws of many states, but it is "predictable" that if a tort is committed against a Wisconsin policyholder, for example, Wisconsin tort law will apply.

*Id.* at 855.

The fact that the insurance policy refers to New York law with respect to fraudulent applications and the appraisal process does not preclude application of Pennsylvania bad faith law. The laws of separate states may be applicable to distinct issues. Our Court of Appeals recently recognized that separate analyses to determine which state's law applies to a bad faith claim and to an issue of contract interpretation "would normally be appropriate." *Robe-*

*son Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160, 168 (3d Cir. 1999).[10] Quoting with approval from *O'Connor v. Busch Gardens*, 255 N.J.Super. 545, 605 A.2d 773, 774 (1992), the Third Circuit observed:

> [C]onflict of laws principles do not require that all legal issues presented by a single case be decided under the law of a single state. Instead the choice of law decisions can and should be made on an issue-by-issue basis, and thus the law of different states can apply to different issues in the same case.

*Id.* at 168.

Applying the relevant Third Circuit case law, and finding the *Thiele* court's reasoning persuasive, I conclude that Pennsylvania's bad faith law should govern this matter. Aside from the property being in New York, all of the other relevant contacts suggest that Pennsylvania has the greater interest in this matter. Pennsylvania clearly has a "more significant relationship" because: (1) the Kilmers are both domiciled and reside in Pennsylvania; (2) the insurance policy in question was negotiated in Pennsylvania; (3) the agent through whom the policy was issued is located in Pennsylvania; (4) the premium was paid in Pennsylvania; and (5) the insurance company who issued the policy is licensed in Pennsylvania. The Third Circuit has made clear that the protection of insured parties is the primary public policy underlying laws governing duties owed by an insurer to an insured. *See General Star*, 960 F.2d at 379. In addition, with regard to Pennsylvania's bad faith statute, courts have held that the "policy behind 42 Pa.C.S.A. § 8371 ... is that the Pennsylvania legislature was concerned about pro-

---

**10.** *Robeson* involved New Jersey law, but New Jersey employs the same choice of law analysis as Pennsylvania.

tecting its own residents/insured from overreaching insurance companies." *Celebre v. Windsor–Mount Joy Mut. Ins. Co.*, No. CIV. A. 93–5212, 1994 WL 13840, *2 (E.D.Pa. Jan.14, 1994) (citing *Thomson v. Prudential Prop. & Cas. Ins. Co.*, Civ. A. No. 91–4073, 1992 WL 38132, *4 (E.D.Pa. Feb.20, 1992)) ("Pennsylvania has a great interest in protecting *its residents* from possible misconduct of insurance carriers operating within its borders.") (emphasis in original).

In conclusion, after employing "a separate analysis to determine which state's law applies to [plaintiff's] bad faith claim," *Robeson*, 178 F.3d at 168, I find that under its conflict of laws principles, in order to ensure that the insured parties are protected from the bad faith of an insurer, Pennsylvania would apply its own local law on the issue of whether Connecticut Indemnity acted in bad faith in its handling of the Kilmers' insurance claim. Accordingly, the Kilmers may invoke 42 Pa. Cons. Stat. Ann. § 8371 as the basis for their action.

## C. *Kilmers' Claim Under Pennsylvania's Bad Faith Law*

In *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir.1997), the Third Circuit declared that the proper standard for bad faith claims under section 8371 is set forth in *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), *app. denied*, 540 Pa. 641, 659 A.2d 560 (1995).[11] In *Terletsky*, the Pennsylvania Superior Court applied a two-part test, both elements of which must be supported by clear and convincing evidence: (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis. *Id.*

■ To prove their bad faith allegation against Connecticut Indemnity, the Kilmers point to various pieces of evidence which ostensibly show the defendant's improper conduct in its handling of their claim. First, they contend that as of September 1, 1998, Connecticut Indemnity knew that: (1) the structure was a total loss; (2) the fire was incendiary; (3) there had been numerous vandalism incidents at the property; (4) Kilmer was nearly two hours away at the time of the fire; and (5) there was no evidence as to who may have caused the incendiary fire. Second, plaintiffs assert that as of October 10, 1998, defendant knew that: (1) a background investigation had been done on the Kilmers; (2) the Kilmers owned a great deal of property in Pennsylvania, Florida, and New York; (3) no judgments were found against Kilmers; (4) no record of any federal or state convictions were found against Mr. Kilmer (5) Mr. Kilmer had a reputation as a hard working man who owned a quarry; and (6) there was no information reflecting any purpose or need for the Kilmers to have caused the fire. Third, the Kilmers contend that bad faith by defendant is exhibited by the fact that Connecticut Indemnity made no further inquiries with respect to the question of arson, including failing to: (1) make inquiries into the Kilmers' assets and liabilities; (2) asking the Kilmers to produce

---

11. Section 8371 states:
 In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
 (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

 (2) Award punitive damages against the insurer

 (3) Assess court costs and attorney fees against the insurer.

income tax returns or other evidence of net worth or debts; and (3) asking the Kilmers to produce any information at the statement under oath that would assist in any investigation relating to alleged arson. And finally, plaintiffs assert that bad faith is shown by defendant's unreasonable delay in the scheduling of the examination under oath.[12] In support of their claim, the Kilmers have produced a report from an insurance practices expert on the appropriateness of defendant's actions and inactions. In her report, Barbara J. Sciotti, A.R.M., opines that "[Connecticut Indemnity] conducted a highly unreasonable investigation that involved dilatory handling and unreasonable evaluation/negotiation practices, and conscious disregard for the Kilmer's. Further, [Connecticut Indemnity] communicated to its insured in a highly unreasonable manner." (Expert Rep. of Barbara Sciotti at 12.)

While not disputing that a delay occurred in the resolution of Kilmers' insurance claim,[13] Connecticut Indemnity takes the position that:

> all of Connecticut Indemnity's actions in the handling of the Kilmer claim fell within the ambit of what an insurer is allowed and required to do under law. The record demonstrates that after a thorough investigation, Connecticut Indemnity was faced with a potentially fraudulent claim. Acting reasonably and in a diligent manner, Connecticut Indemnity requested the Plaintiffs to appear for an examination under oath.

Twenty-nine (29) days later, Connecticut Indemnity decided to honor the claim.

(Def.'s Br. in Supp. of Mot. for Summ. J. at 29.)

This is a close case on whether a jury could find by clear and convincing evidence bad faith on the part of Connecticut Indemnity. The delay in this case is not egregious. On the other hand, Connecticut Indemnity never developed any evidence to suggest that the Kilmers set the fire. Moreover, Connecticut Indemnity did not take steps that would ordinarily be pursued to support a fraudulent claim contention, such as securing income tax returns of the insureds. It knew that the insureds were not having financial difficulties and were in the process of improving the property. Furthermore, the record of Connecticut Indemnity's communications with its insureds (or more properly the lack of communication) is unsettling. Finally, there is the report of the insurance practices expert, who opines that a six-month delay in conducting the Examination Under Oath of the insureds was "highly unreasonable," and that Connecticut Indemnity recklessly disregarded the lack of a reasonable basis to deny the Kilmers' claim and needlessly prolonged the process.

Summary judgment is not favored in doubtful cases. *Velardi v. Walsh,* 40 F.3d 569, 574 (2d Cir.1994). Whether Connecticut Indemnity lacked a reasonable basis for its handling of this claim and effective denial of it until February of 1999 and

12. The Kilmers also contend that bad faith is shown by the fact that Connecticut Indemnity has never stated that the Kilmers were uncooperative in the investigation.

13. In *Kosierowski v. Allstate Ins. Co.,* 51 F.Supp.2d 583, 589 (E.D.Pa.1999), the district court stated that "[d]elay is a relevant factor in determining whether bad faith has occurred, but a long period of time between

demand and settlement does not, on its own, necessarily constitute bad faith. Rather, courts have looked to the degree to which a defendant insurer knew that it had no basis to deny the claimant; if delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred."

whether it recklessly disregarded the lack of a reasonable basis for its actions are questions on which reasonable minds might disagree. Accordingly, summary judgment on the issue is inappropriate.

## III. CONCLUSION

For the foregoing reasons, Connecticut Indemnity's motion for summary judgment will be denied. An appropriate Order follows.